AABY et al. v. STATES MARINE CORPORATION.

No. 120–221.

United States District Court
S. D. New York.
July 26, 1948.

Haight, Griffin, Deming & Gardner, of New York City (John W. Griffin and James M. Estabrook, both of New York City, of counsel), for libelants.

Kirlin, Campbell, Hickox & Keating, of New York City (Charles R. Hickox and Ruth M. McElveney, both of New York City, of counsel), for respondent.

COXE, District Judge.

This is a suit for damages for alleged breach of a time charter, dated August 10, 1937, by which the Norwegian Motor Ship "Tento" was chartered to the respondent for a period of about twelve months from the time of delivery. The vessel was delivered at Sandefjord Harbor, Norway, on December 31, 1937, and was ordered by the respondent to proceed towards St. John, N. B., and, when five days off from there, to communicate by radio with the respondent at New York for further orders.

. Shortly after delivery a small shaft, about 10 inches long and 1⅛ inches in diameter, belonging to the lubricating oil pump of the No. 1 auxiliary motor, broke. The vessel thereupon put in for repairs at Siggrunn, which was near the shipyard at which the vessel had just been overhauled. The repairs were quickly made, and occasioned a delay, all told, of less than two days and a half, after which the vessel proceeded on her voyage. In the intervening period between the signing of the charter and the delivery of the vessel the charter market had fallen, and the respondent seized upon this minor breakdown to repudiate the entire charter on the asserted ground that there had been a breach of the warranty of seaworthiness of the vessel. The critical question in the case is whether this repudiation of the charter by the respondent was justified.

The suit was commenced in January 1940, but its prosecution was considerably delayed by the war, and the trial did not take place until April 1947, with final submission in July 1947. In the meantime depositions of various foreign witnesses were taken by both sides, and the present record consists mainly of these depositions, supplemented by the oral testimony of expert witnesses and an officer of the respondent at the trial.

The charter was signed on behalf of the owner in the name of E. B. Aaby, and the suit was originally brought in the names of E. B. Aaby and E. B. Aaby's Rederi Aktieselskabet, a Norwegian corporation to which the vessel and the charter had been transferred. In the early stages of the litigation it was discovered that E. B. Aaby had died on November 12, 1936, prior to the execution of the charter, and some doubt was thought to exist as to whether the suit could be maintained in the names of the original libelants. An investigation was accordingly made, as a result of which it was ascertained that on E. B. Aaby's death all of his property had passed to Jenny Aaby, his widow, who continued for a short time to carry on the business in his name, as permitted by Norwegian law, and that in the latter part of 1937 she transferred the "Tento" and the charter to the corporate libelant. It also appeared that Mrs. Aaby had died on January 7, 1940, leaving three children, to whom all of her property descended, and who became the sole stockholders of the corporate libelant. A supplemental and amended libel was thereupon filed, substituting the three Aaby children as libelants in place of E. B. Aaby, but without disturbing the corporate libelant, and the respondent makes no contention that the present libelants are not fully qualified to maintain the suit.

Under the terms of the charter, the vessel was chartered to the respondent "from the time of delivery, for about 12 (twelve) calendar months"; there was the usual warranty that on delivery the vessel would be "tight, staunch, strong and in every way fitted for the service"; and the charter hire was fixed "at the rate of $2.00 (Two) U. S. Cy. per ton on vessel's total deadweight carrying capacity, * * *".

Clauses 1, 14, 15 and 16, insofar as pertinent, are as follows:

"1. That the Owners shall * * * keep the vessel in a thoroughly efficient

state in hull, machinery and equipment for and during the service * * *."

"14. That, if required by charterers, time not to commence before November 14 1937 and should vessel not have given written notice of readiness on or before December 31 1937 but not later than 4 P.M., Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

"15. That in the event of loss of time from deficiency of. men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and, if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire.

"16. * * * The Act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this charterparty, always mutually excepted. * * *"

The "Tento" was a Diesel-engine, twin-screw cargo vessel of 4917 gross tonnage, built at Oslo in 1921, and having the highest class rating in Lloyd's during 1937 and 1938. In the Fall of 1937 the vessel was due for her periodical Lloyd's survey, and for that purpose she was completely overhauled at the shipyard of Framnaes mek Vaerksted A/S at Sandefjord, Norway, between December 15 and December 31, 1937. This shipyard had been in the business of building and repairing ships for about fifty years, and was a large yard with an excellent reputation. During the overhaul, the main engines were repaired, all parts of the machinery were inspected and examined, the lubricating oil pump of the No. 1 auxiliary motor was opened up, cleaned, overhauled and put together again, and the various parts, including the shaft, were found to be in satisfactory condition. This work was performed under the direct supervision of Per Björn Röli, Lloyd's surveyor, and Nicolay W. Coch, the owner's consulting engineer, both of whom testified by deposition. After the work was completed, the engines and the auxiliaries were tested under working conditions, and Per Björn Röli, Lloyd's surveyor, certified that the "vessel is in good condition in our opinion eligible to remain as now classed", and issued the usual classification certificates therefor.

Pursuant to the requirement of Clause 14 of the charter, the owner of the "Tento" gave written notice on December 29, 1937, to Sir William Reardon Smith & Sons (London), Ltd., the respondent's London agent, of the readiness of the vessel for delivery "Sandefjord, Friday thirty-first December twelve noon with about 240 tons bunkers". This notice of readiness was apparently relayed by the London agent to the respondent in New York, and on December 30, 1937, the respondent cabled its London agent as follows: "Tento instruct delivery at outermost point Sandefjord harbor outward pilotage only our account accepting vessel if delivers .prior four peem 31st despatching towards St. Johns (sic) N B radioing Statemarine New York five days off STJohns (sic) for further orders but if misses cancelling date and hour would prefer release vessel and would consider ourselves fortunate".

The above cable was received by the London agent at 7:30 a. m. on December 30, 1937, and at 10:30 a. m. on the same day the London agent sent the respondent's representative at Sandefjord a cable reading in part as follows: "Tento please take delivery on timecharter stop vessel to deliver at place we nominate we elect outermost point Sandefjord harbour only outward pilotage our account stop cancelling four peem Friday thirtyfirst if delivers later decline accept stop vessel and machinery must be perfect condition act in conjunction surveyor Elligers of Oslo whom understand there stop * * *."

The respondent, in answer to an interrogatory annexed to the libel, stated that there was a fall in the time charter market between the time when the charter was exe-

tuted and January 3, 1938, of "fifty cents a ton for that type of vessel and the period of the charter".

After the repairs were completed, Johan Elligers, the "surveyor" named in the foregoing cable sent by the respondent's London agent to the respondent's representative at Sandefjord on December 30, 1937, made a survey of the vessel for the respondent and gave a written certificate, dated December 31, 1937, stating among other things: "There are no defects inside or outside to be found as the vessel has just passed survey at surveyor's satisfaction".

The vessel left Sandefjord at 3:00 p. m. on December 31, 1937, and proceeded down the fjord to the "outermost point Sandefjord harbor", which was the point designated by the respondent for delivery. This point was reached at 3:30 p. m. on December 31, 1937, delivery was there made to and accepted by the respondent, and a certificate to that effect was signed by the master and by the respondent's agent, reading as follows:

"Certificate of Delivery.

This is to certify that M/S 'Tento' was delivered on time charter at the port of Sandefjord 31st December 1937 3.30 p. m.

Quantity of Diesel Oil onboard at time of delivery 251.55 tons.

Sandefjord, 31st December 1937.
for Sir William Reardon
Smith & Sons (London) Lim.
as per authority
p.p. Jean B. Linaae
(Signature  W. Knudtzon
illegible)  Master M/S 'Tento' "

The respondent's agent then gave the master written orders to "proceed towards St. Johns" (sic) "N.B. radioing Statemarine New York five days off St. Johns" (sic) "for orders", and the vessel commenced her voyage.

The shaft broke at about 4:20 p. m. on December 31, 1937, and the vessel drifted for about two and a half hours, while an examination was being made of the extent of the damage. At 7:00 p. m. the vessel anchored, and remained at anchor until 6:30 p. m. on the following afternoon, Saturday, January 1, 1938, when a tug took the vessel in tow and brought her to Siggrunn,

where she anchored at 7:05 p. m. On Sunday morning, January 2nd, workmen from the Framnaes mek Vaerksted A/S shipyard came to the vessel from Sandefjord, took off the broken shaft and the four propellers or vanes belonging to the pump, and brought them to the shipyard, where the necessary repairs were made during the day, and the different parts were taken back to the vessel and installed the same evening. The pump was thereafter tested for about two hours, and the vessel got under way from Siggrunn at 2:10 a. m. on Monday, January 3rd. The work at the shipyard consisted solely of supplying a new shaft for the broken one, and making some incidental repairs to the propellers or vanes. The time lost by the vessel as a result of the breakdown was two days, nine hours and forty minutes.

At the time of the delivery of the vessel to the respondent, on December 31st, the master stated that he did not have sufficient oil to reach St. John and requested "wireless instructions bunker port off Hook Holland". This request was promptly conveyed to the respondent's London agent, who radioed the master on January 1st: "Consider ample oil namely 36 days suggest northern passage bear mind Newfoundland * * *." Whether this message reached the master prior to the time the vessel left Siggrunn does not appear, but on January 3rd the respondent's London agent cabled the master at Scheveningen: "Advise present position * * * absence your acknowledgment make northern passage if coming south and require fuel proceed Falmouth". The vessel accordingly proceeded to Falmouth, where she arrived at 6:30 p. m. on January 6th, and remained there until 5:10 p. m. on January 8th. The respondent's London agent paid all inward expenses of the vessel at Falmouth.

In the meantime, and on January 3rd, the respondent cabled from New York to the owner's agent at Oslo: "Tento deliberately delivered not proper condition refuse accept ship consider charterparty canceled", and the contents of the cable were on the same day communicated to the owner by telephone. Discussions were thereafter had, on January 7th and 8th, at London, between

the respondent's London agent and the owner, in an effort to arrive at an accommodation for continuing the charter, but when these discussions failed the vessel was returned to the owner in the evening of January 8th. During the succeeding twelve months the vessel traded for the owner's account under various charters, and operated successfully without any serious mishaps or delays.

1. The expert testimony at the trial was devoted mainly to an attempt to determine the cause for the breaking of the shaft. Ford, testifying for the libelants, was of the opinion that the most likely cause was a latent defect in the metal resulting from a slag inclusion; Baruch and Bagger, testifying for the respondent, were of the opinion that the breakage was due to metal fatigue. As between these divergent opinions it is not possible to make any determination. Nor is it necessary to do so, for the mere fact of the breakdown, so soon after the delivery of the vessel, raised a presumption of unseaworthiness at the time of the delivery (The Southwark, 191 U.S. 1, 14, 24 S.Ct. 1, 48 L.Ed. 65; Federal Forwarding Co. v. Lanasa, 4 Cir., 32 F.2d 154), and this presumption has not been rebutted. Moreover, the warranty of seaworthiness is an absolute one, and does not depend upon the knowledge of the owner or the diligence of his efforts to provide a seaworthy vessel. The Southwark, supra; The Caledonia, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644; Work v. Leathers, 97 U.S. 379, 24 L.Ed. 1012. I therefore find that the vessel was unseaworthy as to the lubricating oil pump at the time of the delivery of the vessel to the respondent.

2. The question remains whether the respondent was justified in repudiating the charter. The position of the libelants on this branch of the case, as stated in their brief, is that "when a vessel is delivered in good faith and after the exercise of due care, she thereupon comes under the terms of the charterparty and the rights of the parties are governed by the charterparty, unless (1) there was fraud in the delivery, or (2) she proves to be unseaworthy to an extent which would frustrate the purposes of the charter". It is the contention of the respondent, on the other hand, that the breakdown of the auxiliary oil pump was a breach of the warranty of seaworthiness of the vessel, and justified the respondent in throwing up the charter.

It appears from the facts already found that the vessel was delivered to, and accepted by, the respondent prior to the canceling date, and thereupon started performance of the charter. The vessel was thus brought under the charter, and the rights of the parties are to be governed by its terms. Clause 15 provides: "That in the event of loss of time from * * * breakdown or damages to * * * machinery * * * the payment of hire shall cease for the time thereby lost, * * *."

Under the decisions, this clause furnishes the only measure of damage for lost time due to the specified contingencies. Clyde Commercial S.S. Co. v. West India S.S. Co., 2 Cir., 169 F. 275; The Ask, D.C.S.D.N.Y., 156 F. 678; Aktieselskabet Stavangeren v. Hubbard-Zemurray S.S. Co., 5 Cir., 250 F. 67; The Bjornefjord, 2 Cir., 271 F. 682.

Clause 16 provides: "The act of God * * * and all damages annd accidents to * * * machinery * * * throughout this charterparty, always mutually excepted * * *."

Whether this language is broad enough to include the warranty of seaworthiness within the exception was left undecided in The Toledo, 2 Cir., 122 F.2d 255, certiorari denied 314 U.S. 689, 62 S.Ct. 302, 86 L.Ed. 551; and The G. R. Crowe, 2 Cir., 294 F. 506, cited by the libelants, is of little value on the subject, for the exceptive clause there specifically stated that "The steamer is not to be accountable for leakage", and leakage was the cause of the damage. Clause 16 was involved in Federal Forwarding Co. v. Lanasa, supra, and, although little was said in the opinion regarding it, the decision allowing a recovery was in effect a holding that the warranty was not within the language of the exception.

In this condition of the authorities I am unable to say that Clause 16 affects the warranty, and I do not think it is necessary to decide the point for the purposes of the decision here.

It is perfectly clear, however, that the breakdown, in the present case, falls squarely within the language of Clause 15, and would ordinarily be dealt with under that clause. It was purely a minor breakdown which, including the time spent in putting back to Siggrunn, occasioned a total time loss of less than two days and a half. For this time loss the respondent is concededly entitled to be relieved from the payment of hire. It also has a right of action for any special damages it may have sustained as a result of the breach of warranty. Federal Forwarding Co. v. Lanasa, supra. Beyond that it should not be permitted to go.

In Scrutton on Charterparties, 14th Ed. p. 99, it is stated in connection with a discussion of the implied undertakings by a ship-owner or carrier as follows: "Such breaches of these undertakings as defeat the commercial purpose of the voyage will justify the hirer of the ship or the owner of the goods carried in repudiating the contract to carry. Such breaches as do not defeat the commercial purpose of the voyage will give rise to an action for damages."

In the present case there is no suggestion that the breakdown in any way interfered with or frustrated the purposes of the charter, and there was no justification whatever for its repudiation by the respondent.

The case of The Toledo, supra, cited by the libelants and by the respondent, supports the position of the libelants. In that case the vessel was time-chartered for "one trans-Atlantic trip". She was delivered at Philadelphia on November 15, 1938 and, after loading part cargo there and at Chester, proceeded to New York to complete loading. The vessel arrived at New York on December 21st, where it was discovered that there was a fracture of the No. 3 crankshaft web. It was found, both by the District Court and the Circuit Court of Appeals, that the fracture was due to a latent defect which rendered the vessel unseaworthy at the time of delivery. Upon the discovery of the fracture the charterer was immediately notified and stopped loading, and on the day following the charterer was advised that the repairs would require thirty days. On January 5, 1939, the charterer canceled the charter, having in the mean-

time discharged the cargo and sent it forward on other vessels. The suit was brought by the charterer for recovery in two capacites: (1) as time charterer, for breach of contract, and (2) as bailee and assignee of cargo, for damages sustained by the cargo owners. The claim of the charterer in the first capacity was allowed only "for unearned hire and unused bunkers as of the time of the breakdown", and the claim in the second capacity was denied entirely, for reasons not pertinent here. The case was one where the purposes of the charter were entirely frustrated, and the charterer was clearly justified in cancellation.

There may be a decree for the libelants, with costs, and the case will be sent to a Commissioner to assess the damages.