## The March.

### Mills, Master, etc., *v.* Tyson and another.

*(District Court, D. Maryland. July 23, 1885.)*

Grain Charter-Party — Construction of Words "Now at Porman, about Ready to Sail, or Already Sailed."

New York agents of the British steamer March were authorized to charter her for a cargo of grain from Baltimore to a British or continental port. The steamer had some time previously sailed from Venice to Porman for a cargo of mineral, and her exact situation was not known. The charter-party contained a stipulation that she was then at Porman, about ready to sail, or had already sailed. She did in fact have one-half her cargo on board, and with favorable weather could have completed her loading in a little over two days, but by unfavorable weather her loading was delayed seven days. *Held,* that the steamer was not about ready to sail, within the meaning of the stipulation, and that the charterers were not required to load her.

In Admiralty.

*R. H. Smith,* for libelant.

*A. W. Machen,* for respondent.

Morris, J. On April 23, 1884, the owners of the British steamer March, by cable authority to their agents, Funch, Edye & Co., of New York, chartered the steamer to Tyson & Brother, of Baltimore, to carry a cargo of grain from Baltimore to a port in the United Kingdom or the continent. The steamer had sailed from Venice to Porman, to take in a cargo of iron ore, to be brought to Baltimore for her owners' benefit, and Messrs. Funch, Edye & Co. had authority to procure for her a grain charter for her return voyage across the Atlantic. The charter-party, executed on the twenty-third of April, described the steamer as "*now at Porman, about ready to sail, or already sailed.*" The steamer did not, in fact, sail from Porman until the afternoon of the thirtieth of April,—a delay of seven days.

The charterers had based their calculation as to the arrival of the

steamer in Baltimore on her leaving Porman not later than the second day after the date of the charter-party; and learning from the newspapers, shortly after the steamer passed Gibraltar, that she did not pass there until May 2d, they chartered, on May 8th, another steamer, at the same rate of freight, to use for the purpose for which they had intended the March. They also, about the eighth of May, notified the representative in Baltimore of Funch, Edye & Co. that if the information they had obtained about the delay in the sailing of the March was correct, they should refuse to load her, and that the agents of the owners might be looking for another charter for her.

The steamer arrived in Baltimore on the twenty-first of May, and after discharging her cargo of iron ore, and having been put in readiness for a grain cargo, she was on the twenty-sixth of May formally tendered to the charterers, who refused to load her. She was rechartered on the twenty-ninth of May at a loss of $1,800, and to recover the loss this libel is brought.

Porman is an open roadstead of the Mediterranean, to which vessels resort for cargoes of iron ore. They are all loaded from lighters, which receive the ore from the beach and bring it out to them, and it is passed up in small baskets from the lighters to the ship. All that appears from the evidence to have been known to Mr. Small, who acted on behalf of Funch, Edye & Co., and to the charterers with regard to the situation of the steamer on April 23d, the date of the charter, was that she, at a certain date, had sailed from Venice for Cartagena to go to Porman to take on a cargo of iron ore to bring to Baltimore.

The fact was that the steamer had left Cartagena on the eleventh of April, and arrived at Porman on the next day, April 12th, and on that same day took on board 120 tons of ore. On the 13th, 14th, 15th, 16th, 17th, 18th, 19th, and 20th the weather was rough, and the surf on the beach so high that the lighters could not work, and the ship received very little cargo on any of those days, and none at all on most of them. The 21st was a favorable day, and she took on about 650 tons, and the 22d was a good working day, and she took on 670 tons. At the close of the 22d they had on board about 1,700 tons. On the 23d (the day on which the charter-party was made) the water was too rough to get cargo, and so continued on the 24th, 25th, and 26th. On the 27th the weather was favorable, and cargo was taken in all day, and on the 28th the weather was favorable until 5 p. m. On the 29th they could not work, and finally, on the 30th, although the weather was not favorable, they took on all they could until 2 p. m., when the ship was unmoored and sailed, having about 2,400 tons on board. It thus appears that the March was in all 18 days loading at Porman; that at the date of the charter-party she had been there 11 days, and had taken on board one-half of the cargo with which she sailed; and that she remained seven days after the date of the charter-party, taking on the remaining half.

In the negotiations of the charter the charterers made no statement to the ship-broker as to the special grain shipment for which they wanted a steamer, but it is well known that in all similar grain charters time is a very essential element, and that the steamer's present situation, her probable sailing, and her expected arrival, are all important elements in the calculations as to her fitness for the charterers' use. In this case the question of the steamer's then situation and her probable arrival were discussed and carefully considered in the negotiations between the ship-broker and charterers, and from the known facts with regard to the date of her leaving Venice it was inferred that either she was well on her way across the Atlantic, or at most would sail in a day or two. The possibility that she might arrive in Baltimore within a few days after the signing of the charter-party led to the insertion of a stipulation that, unless the charterers consented, her lay days in Baltimore should not commence before the first of May.

It is not seriously disputed that the stipulation in the charter-party that the steamer had already sailed, or was then about ready to sail, was a substantive and material part of the contract, and if, upon a fair and reasonable interpretation of its import, in the light of the situation of the parties, it was not true, it is a breach of the contract which justified the charterers in refusing the vessel. *The Whickham*, (*Davison* v. *Von Lingen*,) 113 U. S. 40; S. C. 5 Sup. Ct. Rep. 346.

The contention of the libelant is that, as at the date of the charter the steamer was in such a situation that in from two to three days she could, if not prevented by unfavorable weather, have completed her loading and have been ready to sail, and as the charterers had not stated that they wanted the steamer for any particular shipment of grain, that, within the reasonable latitude of the language used, it was true that she was "about ready to sail."

It is conceded that there was no telegraphic communication with Porman, and that, therefore, her exact situation could not be ascertained.

In construing the language of the contract it is, I think, proper to be considered that the stipulation, "now about ready to sail," was put in the charter-party for the charterers' benefit, and that, so far as the charterers were to be affected by it, it concerns the time of her sailing rather than her readiness to sail. For if, without regard to her actual condition of readiness at the date of the contract, she had sailed within such reasonable lapse of time as would gratify the expression "now about ready to sail," then the charterers could not have complained, for they were obliged to take her, even if she had already sailed. How much cargo she took on board or left behind did not concern them. If she was not in a state of readiness, but sailed in a state of unreadiness, and safely and speedily made the voyage, the charterers would not have suffered by her unreadiness, and it would not have affected their obligations under the contract. And on the

other hand it seems reasonable that, no matter how nearly ready she was at the date of the contract, if there still remained something to be done to make her ready, which, by reason of contingencies, not unlikely to arise, might detain her, and if the contingency should arise and she should be detained beyond the fair latitude of the words "about ready," then, so far as concerns the charterers, they have the right to say the ship was not "about ready to sail." If, for example, she needed one or two men to complete her crew, and was in a place where ships frequently experienced difficulty and delay in getting seamen, if she should get the men the next day and sail, she would, I think, have gratified the stipulation; but if it happened that her sailing was delayed 30 days before she could obtain the men, I think the stipulation would not be gratified.

In this case, the vessel was, at the date of the contract, in such a situation that with a little over two days of favorable weather she might have completed the loading of the cargo, which, for her owner's benefit, she was to take on, and have been ready to sail; but her getting that additional amount of cargo depended on the weather, which had been unfavorable, and continued to be unfavorable, so that, in fact, it was several days before she obtained any additional cargo at all, and seven days elapsed before she completed her loading, and then appears to have come away with less cargo than it was intended she should obtain.

Now, the owner having represented his vessel as being about ready to sail on the 23d, and her sailing having been delayed until the afternoon of the 30th by her inability to get cargo, who is to suffer? Conceding that with half her cargo only on board she could be said to be about ready to sail, if good weather favored the completion of her loading, still, I think she was not about ready if bad weather prevented it; for it is obvious that if, at the date of the charter, it could have been foreseen that a week of continuous bad weather would ensue, it could not truthfully have been said that she was about ready to sail. Who, then, is to suffer the contingency of the bad weather which prevented the completion of the loading? The language of the charter-party is not "now about loaded," but "now about ready to sail," and there is nothing to suggest that the charterers are to be affected by the delays in respect to the completion of her loading. The charterers contracted to take her, provided she was then about ready to sail; and it is plain to see that these words have the same meaning, so far as the charterers are concerned, as "about to sail." The charterers were interested in her readiness only with reference to her time of sailing, and to them the only significance of the words was that she was "about to sail." The case comes, therefore, within the reasoning and principles of *The Whickham*, 113 U. S. 40; S. C. 5 Sup. Ct. Rep. 346. The voyage of the March from Porman to Baltimore consumed 21 days, which was just an average voyage in duration. The delay of seven days was, therefore, one-third of the whole time required

to make the voyage for which she was represented as being about ready.

There was in the charter-party a clause giving the charterers the option of canceling the contract in case the steamer should not be ready for cargo at Baltimore on the seventh of June, but I do not see that this throws any light on the representation with regard to the situation of the ship at the date of the contract. Its only meaning was that even if the voyage was begun in accordance with the contract, yet if it was protracted by any accident, or if by reason of any other contingency the steamer was not ready to receive cargo at Baltimore on or before the seventh of June, the charterers might at their option decline her. It is not a clause which lessens any duty or warranty which the ship-owners had undertaken by any other stipulation of the contract. In my opinion, looking to the fact that at the date of the charter-party the steamer had taken on only about half of her cargo, and looking to the probable interruptions from unfavorable weather which might delay the completion of her loading, and looking to the fact that from that very probable cause she did delay seven days to complete her loading, I do not find that the situation of the steamer gratified the stipulation that she was then about ready to sail, and in my judgment the charterers had the right to refuse to load her.

The libel is dismissed.