**AABY et al. v. STATES MARINE CORPORATION.**

**No. 151, Docket 21541.**

United States Court of Appeals
Second Circuit.

Argued Jan. 30, 1950.

Decided April 12, 1950.

Kirlin, Campbell, Hickox & Keating, New York City, Charles R. Hickox, New York City and Ruth M. McElveney, New York City, for appellant.

Haight, Deming, Gardner, Poor & Havens, New York City and James M. Estabrook, New York City, for appellees.

Before L. HAND, Chief Judge, SWAN and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This appeal is from an interlocutory decree for the owners of the Norwegian Diesel motorship "Tento" which was entered after the trial of a libel by them for damages resulting from the appellant's repudiation of a twelve months' time charter of the ship. Delivery of the vessel by the owners to the charterer was to take place under the charter at port of survey, at the owner's option, by not later than 4 P.M., December 31, 1937. From December 15 to about 3 P.M. on December 31, 1937, the vessel was laid up for repairs at Sandefjord, Norway, but delivery was tendered there at about 3:30 P.M. on the required day. The charterer's surveyor inspected the vessel, found no defects and gave his certificate to that effect, and the master and the charterer's agent signed a certificate of delivery at 3:30 P.M. The latter gave the master written orders to proceed to St. John, N.B., and the vessel sailed. At about 4 P.M., however, a steel shaft in the lubricating oil pump of one of the vessel's three auxiliary motors—she had two main motors—broke, owing either to a latent defect in the metal or to metal fatigue. The vessel stopped at about 4:20 apparently not because the breaking of the shaft made her unnavigable but to determine the extent of the damage. She then drifted until about 7 P.M. when she anchored, and remained at anchor until about 6:30 P.M. on January 1, 1938. At that time, her anchorage being dangerous, she was assisted by a tug to return to Siggrunn, Norway. Her engines had failed to start at 6:10 P.M., because insufficient starting air had been pumped up, but by about 9 P.M. they started, and were used in maneuvering to anchorage at Siggrunn. Repairs were commenced on the morning of January 2, were completed that night, and the vessel sailed at 2:10 A.M. on January 3, the total delay thus amounting to about two and one-half days.

On January 3, 1938, the charterer informed the owner's agent at Oslo that it refused to accept delivery and that they should consider the charter party cancelled. When efforts to agree as to continuing the charter failed, the vessel was returned to the owners on January 8. Suit was begun by the owners in January, 1940, but, as a result of the war, the case did not come to trial until April 1947. The court below found that the vessel "was unseaworthy as to the lubricating oil pump" at the time of delivery, but held that repudiation of the charter was not justified, on the alternative grounds that (1) "there is no suggestion that the break down in any way interfered with or frustrated the purposes of the charter, * * *" 80 F.Supp. 328, at page 333, or that (2) delivery and acceptance of the vessel having taken place, the "warranty" of seaworthiness was supplanted by the breakdown clause in the charter, providing "That in the event of loss of time from * * * breakdown or damages to * * * machinery * * * the payment of hire shall cease for the time thereby lost, * * *" Concededly, however, the charterer was entitled to relief from the payment of hire during the period of delay caused by the breakdown, and the decree permitted the determination and allowance of that in computing the damages.

We agree with the result reached by the district court. It is true that, from the fact that the shaft broke almost immediately after the delivery of the vessel it could properly be inferred that it was defective at the time of delivery. The Southwark, 191 U.S. 1, 13-14, 24 S.Ct. 1, 48 L.Ed. 65; Federal Forwarding Co. v. Lanasa, 4 Cir., 32 F.2d 154, 156-157; The Nomad, D.C.N.J., 3 F.Supp. 535; Scrutton on Charterparties and Bills of Lading (12th ed.) pp. 101-02. It is also true that the exercise of diligence to discover the defect or lack of knowledge of it is im-

material, the terms of the charter party or of a controlling statute not being to the contrary. Work v. Leathers, 97 U.S. 379, 24 L.Ed. 1012; The Caledonia, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644; The Carib Prince, 170 U.S. 655, 18 S.Ct. 753, 42 L.Ed. 1181; Federal Forwarding Co. v. Lanasa, supra.

But this does not mean that there was necessarily a breach of the undertaking expressed here as "Vessel on her delivery to be tight, staunch, strong and in every way fitted for the service * * *" Such an undertaking seems to be equivalent to what is generally called the "warranty" of seaworthiness that is implied in all contracts concerning vessels in the absence of an express and unambiguous stipulation to the contrary. See Luckenbach v. W. J. McCahan Sugar Ref. Co., 248 U.S. 139, 150, 39 S.Ct. 53, 63 L.Ed. 170, 1 A.L.R. 1522; The Josephine, 3 Cir., 49 F.2d 207, 209; Carver on the Carriage of Goods by Sea (7th ed.) § 144.

Not every defect needing repair or causing damage amounts to a breach of undertaking. Middleton & Co., (Canada), Ltd., v. Ocean Dominion S. S. Corp., 2 Cir., 137 F.2d 619, 622, certiorari denied 320 U.S. 802, 64 S.Ct. 432, 88 L.Ed. 484; The Sandfield, 2 Cir., 92 F. 663; Hedley v. Pinkey & Sons S. S. Co., (1894) A.C. 222. The evidence tends to show that the breaking of the shaft was of little importance with respect to the operation of the vessel, though it is apparent that the defect was not remediable at sea, or in a few minutes with the materials available on board. Even so, were we forced to take the view that any breach, no matter how petty, of the undertaking of seaworthiness operates "to entitle the injured party not only to sue for damages but also to refuse to continue performance," see 4 Williston on Contracts § 1080, this case would demonstrate the harsh consequences of such a view. Perhaps the court below felt similarly, for it did not unqualifiedly hold that the "Tento" was unseaworthy; rather, it held, that she was "unseaworthy as to the lubricating oil pump."

Authoritative support for the view that any breach of the undertaking of seaworthiness permits repudiation has, however, not been found. The authorities reveal some confusion as to the meaning of the term "warranty," as well as to the legal consequences of a breach of "warranty"; as to whether a ship-owner's undertaking of seaworthiness is a "warranty," and indeed even as to the reason for implying such an undertaking in contracts.

The general American view is that a "warranty" is a guaranty that a certain fact is true. See 4 Williston on Contracts § 1075. Thus, when an owner "warrants" that a certain situation exists, he promises that it does exist, and the obligation of the charterer is conditioned upon the existence of that situation. Davison v. Von Lingen, 113 U.S. 40, 5 S.Ct. 346, 28 L.Ed. 885.

By this definition, then, any breach of warranty permits rescission,[1] as well as an action for damages. The English authorities have, however, at times—particularly with respect to contracts of insurance—defined a warranty as simply a condition,[2] though they have said that the right to repudiate the contract for breach of the condition may be waived and a cause of action for damages be had.[3] At others, they have defined a warranty as a promise giving rise only to a cause of action for damages,[4] and they have done so particularly

---

1. See Ashurst, J., in De Hahn v. Hartley (1786), 1 T. R. 343, 346, 99 Eng.Rep. 1130, 1131 (K. B.): "The very meaning of a warranty is to preclude all questions whether it has been substantially complied with; it must be literally so." See also Lowber v. Bangs, 2 Wall. 728, 17 L.Ed. 768.

2. Mansfield, L. J., speaks of "a warranty or condition" in Pawson v. Watson (1178), 2 Cowp. 786, 787, 98 Eng.Rep. 1361, 1362 (K. B.).

3. Bentsen v. Taylor, Sons & Co. (1893), 2 Q. B. 274 (C. A.).

4. See Bentsen v. Taylor, Sons & Co., supra, at 280; "* * * it still remains to be decided by the court, as a matter of construction, whether it is such a promise as amounts merely to a warranty, the breach of which would sound only in damages, or whether it is that kind of promise the performance of which is made a condition precedent to all further demands under the contract by the person

as to contracts of sale.[5] This confusion has not been lessened by recent American insurance cases not articulating whether the ground of decision is that there was no warranty, or that there was no breach, or that the breach was insubstantial.[6]

With respect to the undertaking of seaworthiness on the part of the owner of a vessel, it is usually said [7] that it is a "warranty," implied in the absence of an express and unambiguous stipulation or a controlling statute to the contrary. Scrutton, however, speaks of it as being a "condition" similarly implied. Charterparties and Bills of Lading (12th ed.) p. 95. And it has sometimes been spoken of as simply a "covenant." The Steel Navigator, 2 Cir., 23 F.2d 590; Franklin Fire Ins. Co. v. Royal Mail Steam Packet Co., 2 Cir., 58 F.2d 175, certiorari denied 287 U.S. 630, 53 S.Ct. 82, 77 L.Ed. 546; Wilson v. Griswold, C.C.S.D.N.Y., Fed.Cas. No. 17,806. Williston considers that "The basis of the undertaking of seaworthiness is the same as that of implied warranties in the sale of goods; the shipowner is in a position to know the condition of his ship and the charterer justifiably relies upon his judgment." 4 Williston on Contracts § 1078. But this would not seem to explain the unquestioned line of authority [8] that the undertaking of seaworthiness is absolute in the sense that the owner's exercise of due diligence to discover defects is immaterial. As Lord Blackburn, in Steel v. State Line S. S. Co., (1887) 3 A.C. 72, 86, put it, the obligation is not merely that the owners "should do their best to make the ship fit, but that the ship should really be fit. The problem is not made any simpler when, as

here, there is an express stipulation of seaworthiness but that stipulation is not made one of the express "conditions" to the contract, and is contained in the preliminary recital of agreements between the parties.

In the midst of this confusion, however, one thing rather clearly appears: that repudiation by a charterer is permissible only where the breach of the owner's undertaking of seaworthiness is so substantial as to defeat or frustrate the commercial purpose of the charter. The English authorities speak in these terms. Tarrabochia v. Hickey, (1856) 1 H. & N. 183, 156 Eng.Rep. 1168; Tully v. Howling, (1877) 2 Q.B.D. 182; Stanton v. Richardson, (1872) L.R. 7 C.P. 421, aff'd, (1875) L.R. 9 C.P. 390 (Exch.), aff'd H.L., see (1875) 1 Q.B.D. 381; see Scrutton, supra, at pp. 96, 103; Carver, supra, § 145. There are no American cases to the contrary. Thus, it has been said that "the stipulation of seaworthiness is not so far a condition precedent that the hirer is not liable in such case for any of the charter money. If he uses her, he must pay for the use to the extent to which it goes." Work v. Leathers, 97 U.S. 379, 380, 24 L.Ed. 1012; The Toledo, 2 Cir., 122 F.2d 255, 257, certiorari denied Isbrandtsen-Moller Co. v. The Toledo, 314 U.S. 689, 62 S.Ct. 302, 86 L.Ed. 551. The preliminary statement in a charter party as to the vessel's registered tonnage has been similarly treated, substantial compliance therewith being held sufficient, at least where the vessel has been designated by name and the kind and quantity of cargo has been specified. Watts v. Camors, 115 U.S. 353, 6 S.Ct. 91, 29 L.Ed. 406. Thus also, breach

---

who made the promise against the other party * * *"

Compare Metropolitan Coal Co. v. Howard, 2 Cir., 155 F.2d 780, 784: "A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past. * * *"

5. See Patterson, Warranties in Insurance Law (1934), 34 Col.L.Rev. 595.

6. See Fidelity & Deposit Co. of Maryland v. Friedlander, 6 Cir., 101 F.2d 106; Diesinger v. American & Foreign Ins. Co., 3 Cir., 138 F.2d 91; Foley v. Sonoma County Farmers' Mut. Fire Ins. Co., 18 Cal.2d 232, 115 P.2d 1.

7. See 4 Williston on Contracts § 1078; Carver on the Carriage of Goods by Sea (7th ed.) §§ 17–21.

8. Work v. Leathers, supra; The Caledonia, supra; The Carib Prince, supra.

of a provision that the vessel shall sail with all convenient speed, "reasonable dispatch," or the like has been held not to justify repudiation unless delay has been so great as to frustrate the object of the charter. Clipsham v. Vertue, (1843) 6 Q.B. 265, 114 Eng.Rep. 1249; see 4 Williston on Contracts, § 1079.

■ We take it, then, that the undertaking of seaworthiness is to be treated like any other contractual undertaking not expressly made a condition precedent to a party's performance of his obligations: an insubstantial breach of it, not going to defeat the object of the contract, will not justify repudiation. This, it is true, may raise some speculative difficulties. The majority of the Supreme Court in Lowber v. Bangs, 2 Wall. 728, 17 L.Ed. 768, like the Court of Exchequer in Behn v. Burness, 3 B. & S. 751, 122 Eng.Rep. 281, found difficulty with the concept "that a statement of this kind in a charter-party, which may be regarded as a mere representation, if the object of the charter-party be still practicable, may be construed as a warranty, if that object turns out to be frustrated, because the instrument, it should seem, ought to be construed with reference to the intention of the parties at the time it was made, irrespective of the events which may afterwards occur." But the basis for this trouble lies in the unarticulated premise that a promise or a statement is either a warranty or not a warranty depending upon whether or not it is "material." 9 If we refer to what the parties to a charter probably intend, it would seem sufficiently plain that the right to repudiate is to depend upon whether the object of the charter is or is not substantially frustrated by the breach.

■ Under the view we have taken, it is clear that repudiation here was not justified: two and one-half days' delay in the course of a twelve months' time charter can hardly be considered so substantial as to frustrate the purpose of the charter. And, under this view we need not deal with the contention of the owners that, the charter having been entered upon, the break-down clause or the clause excepting accidents to machinery controls, except to point out how such a contention appears to be inconsistent with the whole body of the law relating to seaworthiness. See The Caledonia, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644; The Carib Prince, 170 U.S. 655, 18 S.Ct. 753, 42 L.Ed. 1181.

■ However, as best as we can make out the charterer's argument, it seems to make the point that if the vessel had not been tendered until an hour later, when the breakdown occurred, the clause in the charter authorizing cancellation "at any time not later than the day of vessel's readiness," specified as 4 P.M. on December 31, at the owner's option, would have become operative and would have permitted the charterer to cancel. But the answer to this would seem to be that the delay occurred after delivery and acceptance of the vessel and not before. A breakdown occurring a month later would not have justified cancellation under the clause. We cannot see that it makes any difference that the breakdown occurred only an hour after delivery.

Decree affirmed.

9. See 4 Williston on Contracts § 1075: "But in the United States the untruth of a statement material enough to be called a 'warranty' * * *" Or again, see id. at § 1080; "Under the second view, the preliminary inquiry whether an undertaking amounts to a warranty depends on the materiality of the promise."