STATES STEAMSHIP COMPANY et al., Appellant,

v.

AMERICAN SMELTING & REFINING COMPANY, Appellee.

No. 19274.

United States Court of Appeals
Ninth Circuit.

Dec. 4, 1964.

Certiorari Denied April 5, 1965.
See 85 S.Ct. 1109.

Gilbert C. Wheat, H. Donald Harris, Jr., Lillick, Geary, Wheat, Adams & Charles, San Francisco, Cal., for appellant.

Stephen McReavy, Lee H. Cliff, Hall, Henry, Oliver & McReavy, San Francisco, Cal., William G. Symmers, Symmers, Fish & Warner, New York City, for appellee.

Before ORR, JERTBERG and MERRILL, Circuit Judges.

ORR, Circuit Judge.

In this appeal we have one question for decision, to wit: Is appellee's claim time-barred by the one-year limitation provision of Section 3(6) of the Carriage of Goods by Sea Act of 1936 (COGSA)? (46 U.S.C. § 1303(6)). We affirm the trial court in its determination that it is not.

Libelant-Appellee is the American Smelting and Refining Company (herein Asarco). The Respondent-Appellant is the States Steamship Company (herein States).

The facts have been stipulated. They are:

"* * * 3. At all times mentioned herein States owned and operated the vessel formerly known as the SS CHARLES E. DANT.

"4. On November 27, 1956 approximately 8400 tons of copper concentrates were laden aboard the SS CHARLES E. DANT at Poro Point, La Union, Philippines, consigned to Asarco at Tacoma, Washington.

"5. Asarco acquired title to said copper concentrates when they were loaded aboard the SS CHARLES E. DANT and at all times hereinafter mentioned was the owner and consignee of said concentrates.

"6. The Bill of Lading constituting the contract of affreightment which governs the rights and liabilities of the parties hereto, insofar as it is applicable, is attached as Exhibit A.

"7. Shortly after departure from Poro Point on November 27, 1956 the SS CHARLES E. DANT took a serious list, necessitating salvage services which were rendered and which enabled the vessel to continue the voyage.

"8. Said salvage services were rendered pursuant to a Salvage Agreement entered into by States on behalf of the vessel and her cargo * * *. Security was given to salvor on behalf of the vessel and her cargo in order to release the vessel and cargo from the salvor's lien.

"9. On January 17, 1957 Asarco entered into an Average Agreement with States in order to obtain possession of the cargo * * *

"10. On or before February 11, 1957 said shipment of copper concentrates was delivered to Asarco at Tacoma, Washington.

"11. The amount of the salvage award was arbitrated between salvor on the one hand and Asarco and States, on the other, in accordance with the Salvage Agreement. On October 28, 1958 the Salvage Award became final. Thereafter Asarco and States each paid to salvor its respective share of the amount awarded by the arbitrators.

"12. On March 16, 1959 Asarco filed the libel in this action to recover its portion of salvage paid.

"13. States plead, in defense, the one-year statute of limitations contained in the United States Carriage of Goods by Sea Act of 1936, Section 3(6), 46 U.S.C. § 1303(6).

"14. If the court concludes that this cause is time-barred, the libel should be dismissed with prejudice.

"15. If the court concludes that this cause is not time-barred, States is liable in personam and as claimant of the SS CHARLES E. DANT in such amount as may be determined by the Court or agreed by the parties."

Section 3(6) of COGSA provides:

"Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of the delivery.

"Said notice of loss or damage may be endorsed upon the receipt for the goods given by the person taking delivery thereof.

"The notice in writing need not be given if the state of the goods has at the time of their receipt been the subject of joint survey or inspection.

"In any event the carrier and the ship shall be discharged from all liability in respect of *loss or damage* unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered: Provided, That if a notice of loss or damage, either apparent or concealed, is not given as provided for in this section, that fact shall not affect or prejudice the right of the shipper to bring suit within one year after the delivery of the goods or the date when the goods should have been delivered.

"In the case of any actual or apprehended loss or damage the carrier and receiver shall give all reasonable facilities to each other for inspecting and tallying the goods." (emphasis provided)

Appellant's contention is, basically, that "loss or damage" as used in the above cited statute covers any claim for damages by a shipper where liability is based upon a carrier's breach of its contract of affreightment. Appellant cites cases in support of its contention, wherein intangible damage to the cargo interest—such as late delivery or misdelivery—has been held to be loss or damage within the meaning of Section 3(6). It argues that this case is one in which an intangible injury to the cargo appears and hence it comes within the unmodified and unrestricted "loss or damage" provision.

█ Viewing the context in which the limitation provision is set, we feel that logic and sound analysis require that "loss or damage" be interpreted in a narrower sense than contended for by appellant. The wording compels the conclusion that said provision was intended to apply only to claims which relate directly to a breach of a carrier's duty to make timely delivery of the goods in good order and condition.

The cases are not at variance with this view. The limitation provision of Section 3(6) has been applied mainly to instances involving damage directly to the

cargo. It has also been applied where there has been delay in, or failure of, delivery or departure. See Commercio Transito Internazionale, Ltd. v. Lykes Bros. Steamship Company, 243 F.2d 683 (2d Cir. 1957); Badhwar v. Colorado Fuel and Iron Corp., 138 F.Supp. 595 (S.D.N.Y.1955), aff'd, 245 F.2d 903 (2d Cir. 1957), cert. denied, 355 U.S. 862, 78 S.Ct. 95, 2 L.Ed.2d 68 (1957); Singer Hosiery Mills of New York v. Cunard White Star, Ltd., 199 Misc. 389, 102 N.Y.S.2d 762 (1951); Albert Isbrandtsen Company, 7 Misc.2d 67, 160 N.Y.S.2d 772 (1957). In the above cited cases the damage arose directly from and was related directly to a failure to make a proper delivery of the cargo owner's goods.

This Act, derived from the terms of the Brussels Convention of 1924, has been adopted by many nations, but in no case that has come to our attention has it been held that an action by a cargo owner to recover salvage paid is within the limitation provision here under consideration. A contention similar to this, however, was presented in the case of Goulandris Bros., Ltd. v. B. Goldman & Sons, Ltd., [1957] 2 Lloyd's Rep. 207 (Q.B.D., Com.Ct.), and was rejected. There, at page 222, the court stated that "the loss or damage referred to must be loss or damage which is related to the cargo owner's goods." Appellant states that the rule in Goulandris was overturned by the subsequent House of Lords decision in Anglo-Saxon Petroleum Company v. Adamastos Shipping Company, Ltd., [1957] 1 Lloyd's Rep. 79 (Q.B.D.), [1957] 2 All E.R. 311 (C.A.), [1958] 1 All E.R. 725 (H.L.). We do not so read that case. The British authorities, though they now indicate that the words "loss or damage" in the limitation provision here involved are broad enough to include loss by delay or misdelivery, do not go so far as to say that a claim such as is presented in the instant case constitutes a suit for "loss or damage" within such provision. See Carver, 2 British Shipping Laws §§ 224–30 (1963).

█ We conclude that a distinction between the cause of action presented here and those that have been held to be governed by Section 3(6) is clearly drawn. The instant action is in reality one for indemnification, the right to which arises from the carrier's alleged violation of the duty of due diligence imposed upon him by law.[1] The gravamen of appellee's claim is that: Appellant failed to exercise due diligence in the carriage of appellee's goods; because of this a salvage operation was necessary and the appellee, in order to get delivery of the goods, was obliged to agree to pay, and paid, its general average share of the salvage costs; now it is seeking reimbursement for the amount paid, which burden, as between it and appellant, should be borne by appellant. This spells out an indemnity action—appellee is seeking indemnification for salvage paid pursuant to the Average Agreement. See Restatement of Restitution § 76 (1936); Hidick v. Orion Shipping and Trading Company, 157 F.Supp. 477 (S.D. N.Y.1957); Tice Towing Line v. James McWilliams Blue Line, 51 F.2d 243 (S.D. N.Y.1931), modified, 57 F.2d 183 (2d Cir. 1932).

That it was neither the intent of the Brussels Convention of 1924 in drafting the section of the Act here under consideration, nor the intent of the Congress in enacting it, to include such indemnity actions within the claims governed by Section 3(6) of COGSA is amply supported by the circumstances involved.

█ By the terms of Section 3(6) the statute of limitations begins to run at the time of *delivery*. In actions that involve damage directly to the cargo or relate directly to the cargo the statute of

---

1. Section 3 of COGSA is the source of this duty, a duty which exists regardless of any provision in the contract of affreightment incorporating a requirement of due diligence into the agreement between the parties. It would not seem, however, to matter whether this duty is viewed as arising as a matter of law or by virtue of the shipping contract—the indemnity nature of the action here is the same.

limitations traditionally and logically begins to run at the time of delivery. It is at this time that the shipper becomes aware of "loss or damage" and generally at this time that the cause of action accrues. Such is not the case with the usual indemnity claim, where a cause of action does not accrue until the indemnitee has made actual *payment.* See Restatement of Restitution § 77 (1936); 3 Moore's Federal Practice § 14.09 (2d Ed. 1963); Chicago, Rock Island & Pacific Railway Company v. United States, 220 F.2d 939 (7th Cir. 1955); Christianssand Shipping Company, Ltd. v. Marshall, 31 F.2d 686 (3rd Cir. 1929); Hidick v. Orion Shipping and Trading Company, supra, 157 F.Supp. pp. 487–88. The date of payment, and thus the date when a party is in a position to sue, will seldom coincide with the date of delivery. Thus imposing a "time of delivery" starting date upon actions such as we have before us would give rise to an illogical and often unreasonable situation. For example, in the instant case payment was made, and the right to recovery arose, after October 28, 1958. This was some 8 months after the statute of limitations under Section 3(6) had run. Appellee *could not* make payment until subsequent to the arbitration of the salvage claim, and therefore ordinarily *could not* sue to recover payment until the amount of salvage had been determined and payment made. By that time the statute of limitations contained in Section 3(6) had run. No equitable result can be found in such an interpretation.

Appellant urges that a procedure could be employed that would allow a suit to be filed in such a case at the time of delivery, and then stayed until determination of the amount of the award and payment thereof. To impose such a burden upon the claimant to anticipate at the time of delivery the nature and extent of his claim for damages, and to impose a burden upon the courts to indulge in this staying procedure, cannot be said to have been within the reasonable contemplation of Congress.

Legislative history is pointed to for the purpose of sustaining the construction which appellant would place on the provision under consideration. We do not believe it in any manner detracts from the construction we have adopted.

Affirmed.