**UNITED STATES of America,**
**Appellee,**

v.

**M/V MARILENA P and her appurte-**
**nances, in rem, and Marilena Compania**
**Naviera, S. A., a corporation, in per-**
**sonam, Appellants.**

No. 12890.

United States Court of Appeals,
Fourth Circuit.

Argued March 5, 1969.

Decided May 23, 1969.

Nicholas J. Healy, New York City, and Braden Vandeventer, Jr., Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., and Healy & Baillie, New York City, on brief) for appellants.

Stephen R. Felson, Atty., Dept. of Justice (William D. Ruckelshaus, Asst. Atty. Gen., and Robert V. Zener, Atty., Dept. of Justice, and C. Vernon Spratley, Jr., U. S. Atty., on brief) for appellee.

Before BRYAN, WINTER and CRAVEN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

In admiralty asking damages, the United States complained of the M/V Marilena P and her owner, Marilena Compania Naviera, S.A., for nullifying a charter party. The controversy grew out of the crew's refusal to sail. As the ad-port was within the Viet Nam war theatre and the ship's lading was combat materials, they declined the voyage, either as too perilous or for some other reason not clearly recorded. The charterer argues that the ship thus became unseaworthy, in violation and dissolution of the charter. The shipowner, responding for itself and as the vessel's claimant, traversed the libel, and also counter-demanded damages upon the assertion that the Government had reneged on its agreement.

Appealing against a wholly adverse judgment, the shipowner persuades us to its view. The fact environs of the disagreement are well told by the District Judge in his findings:

"(1) On 13 August 1965, pursuant to contacts made 11 August 1965, a time charter party was entered into between MSTS [Military Sea Transportation Service of the United States] and MARILENA COMPANIA NAVIERA,

S.A., under which the M/V Marilena P, of Greek Registry, was hired at the rate of $2,400.00 per day for a voyage from the West Coast of the United States to South Viet Nam. These arrangements were concluded between Christian Hurt of International Navigation Company, Inc. of New York, broker for the vessel's owner, and Howard Cradick of MSTS, Washington office.

"(2) A confirmation of the Fixture of the vessel to the United States Government was made by wire on 14 August 1965, directing the ship to proceed to U. S. West Coast between 25 August and 3 September. The voyage was specifically set forth as from a U. S. West Coast port to one or more ports South Viet Nam. While no other formal contract was actually signed, the parties stipulate that the agreement concluded was on the basis of MSTS Dry Cargo War Risk Form.

"(3) On 1 September 1965 the MARILENA P was formally tendered by the owner to MSTS at Seattle. Bunkers were taken aboard and the vessel shifted to Tacoma for loading. At 1925 hours, 1 September 1965, MSTS cargo, in the form of ammunition, rations, and other combat military goods was started aboard.

"(4) About 400 tons of such military cargo had actually been loaded aboard the M/V MARILENA P by 1500 hours, 2 September 1965, when all of the officers and crew, with the exception of the master, chief mate and chief engineer, walked off the vessel and stated that they refused to sail the ship to South Viet Nam.

"(5) Loading was discontinued and while the crew ultimately returned to the vessel, they refused, and continued to refuse, to sail to South Viet Nam and such refusal continued through 8 September 1965.

"(6) On Friday, 3 September 1965, MSTS notified the master of the ship as follows:

'1. The Government has been informed by your representatives that the crew of the MARILENA P have refused and continue to refuse to sail the MARILENA to contracted ports in South Viet Nam. This condition has existed at least since 2 September 1965. You are accordingly unable to perform your contract obligations and are in substantial breach. If you do not cure this deficiency of crew and present evidence of ability to perform by 0900 hours local Tacoma, Washington time 8 September 1965, the Government will consider your contract terminated by reason of your default. In such case the Government will arrange discharge of cargo now loaded and will hold you accountable for all extra costs and damages resulting. (signed) Captain J. W. Lipscomb, Jr., S.C., U.S.N., Contracting Officer'.

"(7) On the following date, 4 September 1965, at 1800 hours, there being no indication that the crew of the MARILENA P intended to change their minds, MSTS commenced off loading the approximately 400 tons which had been placed aboard the vessel. The off loading continued until completed on Sunday, 5 September 1965, at which time the vessel was shifted from the cargo pier to a lay berth nearby.

\*　　\*　　\*　　\*　　\*　　\*

"(9) On Tuesday, 7 September 1965, the owner's representative from Greece, Captain Yannakis, attempted to persuade the Greek crew to sail to South Viet Nam but was unsuccessful. Captain Yannakis, apparently fearful of his ability to so persuade the crew, had made preliminary arrangements in Greece and in New York to secure a skeleton replacement crew, but efforts to ferry the crew to Tacoma were canceled prior to 8 September 1965.

"(10) MSTS, in the meantime had diverted the MORMACRIGEL [then also under charter] from San Francisco on 4 September 1965. This vessel arrived in Tacoma on 6 September 1965 and the cargo originally scheduled for MARILENA P was loaded aboard the

MORMACRIGEL and she ultimately sailed.

\* \* \* \* \* \*

"(16) On 8 September \* \* \* the broker for the MARILENA P, informed \* \* \* MSTS ' \* \* \* there is no denial on the part of the owner that he cannot perform the contract \* \* \* '."

"(17) On 8 September 1965, MSTS at Washington notified the agents of MARILENA P that pursuant to the ultimatum of 3 September 1965, since MARILENA P was unable to perform, the charter was terminated."

I. In our judgment no breach of the charter was committed by the respondent shipowner. The admiralty judge concluded that when presented to the charterer at Seattle on September 1, the Marilena P was unseaworthy because she was then "without a crew willing to sail the vessel to South Viet Nam". This determination, we think, is not altogether precise.

A few minutes past midnight of August 31–September 1 at Seattle she was an arrived ship. An MSTS Deputy Operations Officer there boarded her, and with the first officer and a marine surveyor "made a thorough tour of the ship"—an on-hire survey. Thereafter, about 8 o'clock A.M. September 1, the Marilena P was accepted by the Government. She was then fueled by the charterer and, at its direction the vessel was moved to Tacoma.

At her new berth, loading commenced about 7:30 P.M. September 1. Neither before nor during that day did the crew protest the scheduled passage to South Viet Nam, although the log notes some grumblings. There was no cessation in the loading until between 2 and 3 o'clock on the afternoon of September 2nd. The record indicates no reluctance of the longshoremen to carry on the cargo.

■ Hence, MSTS can hardly be heard to say that the vessel was unseaworthy on September 1. The owner at that time had no warning or premonition of the group's recalcitrance. They had signed on for a definite period, including August and September 1965, without restriction of destination. It was not incumbent upon the owner or master to ask if they were willing to ship to Viet Nam. Their defiance was in violation of Greek law, and on return to Athens some of them were punished for their disobedience.

■ But, conceding arguendo the strike created unseaworthiness amounting to an infraction of the charter, no right of repudiation was automatically conferred upon the United States. The promises of seaworthiness in the charter were not made conditions, nor did the crew's inaction constitute a frustration of the hiring of the ship.[1] From the context of the contract it is plain that their breach did not give an election forthwith to the charterer to wind up the arrangement on account of this development.

The parties quite explicitly evidenced their understanding that a contingency of this kind should not, ex proprio vigore, end it. They foresaw the possibility and stipulated a remedy, at least for a temporary wait in the departure. This is the stipulation:

"Article 17. Off-Hire.

"(a) In the event of loss of time *from deficiency of men including but not limited to strikes* \* \* \* the payment of hire shall cease from the time thereby lost \* \* \*." (Accent added)

This provision refutes the option claimed by the Government to withdraw immediately from its contract upon inception of a strike. The conclusively manifested intention of the parties was that a breach of this nature was not to be accompanied by such grave results. Consequently, we need not and do not decide the much debated question of

---

1. Frustration of a charter party is a change of conditions so radical that accomplishment of the commercial object of the charter is made impossible. See Gilmore & Black, Admiralty at 198.

when unseaworthiness or what degree thereof, without more, justifies renunciation by the charterer. See Aaby v. States Marine Corporation, 181 F.2d 383, 386 (2 Cir. 1950).

Of course, cancellation might have been imposed if the strike so plainly appeared unsolvable as to be a frustration, but that was not the appearance here. This, the United States acknowledged by indulging the owner additional time to obtain a full company. Tolerance in this respect is not uncommon; in the Government's charter of the Mormacrigel, 12 days waiting time was permitted. Further, nowhere in the charter was time declared of the essence. Indeed, it has not been stressed at any stage of the case. Overtopping all considerations, however, it must be recalled that the hindering event was not of the owner's making or neglect.

Finally, the assurance of seaworthiness was not absolute as it would be in the absence of qualification. Each assurance is modified in terms of due diligence. Therefore, the duty to maintain a crew was not unconditional. Once reasonable care was exerted, unseaworthiness non obstante was not a transgression of the charter. This understanding is punctuated by the following charter clauses:

"Article 4. Delivery of the Vessel:

"(b) * * * Vessel on delivery shall be, *insofar as due diligence can make her so*, seaworthy, tight, staunch, strong, and in every way suitable and adequately fitted for and in all respects ready to receive and transport lawful cargo. * * *" (Accent added)

"Article 18. Owner's Obligation:

"(a) * * * The Owner shall use *due diligence* * * * to keep the Vessel in a thoroughly efficient state in * * * *personnel* * * * relating to the seaworthiness of the Vessel * * *" (Accent added)

While the due diligence must be established by the shipowner, we think the proof here abrim in this demonstration.

Nothing prior to presentation of the ship for service, as earlier noted, even remotely indicated intransigence of the crew. Vigilance in its discovery could not be expected without some prior clue of the men's dispositions. At once upon learning on September 4 of the revolt, respondent's port captian left Greece and went to Seattle. He offered the crew double pay. Ten replacements were recruited in Athens and the earliest available flight reservations for them obtained. Four more were secured in New York. The ship's company had consisted of 40, but the captain could not induce enough of the insubordinates to make up the requisite complement.

Furthermore, the Government cannot fairly charge lack of diligence. As heretofore stated, on September 3 the United States allowed the owner until September 8 to make good the deficiency of crew. Nevertheless, on September 4— within an hour or two after it issued this deadline—the Government arranged with the Mormacrigel to pick up the freight intended for the Marilena P. At that moment 400 tons of it were in her holds. On the same day, September 4, this laden was removed by the Government. Before September 8 the substitute vessel sailed away with the entire tonnage.

In Aaby v. States Marine Corporation, supra, 181 F.2d 383, 386, the Court refused to allow such impetuous action. Noting the differences among the authorities, at home and aboard, on the remedies for charter infringements or defaults, the opinion stated:

"in the midst of this confusion, however, one thing rather clearly appears; that repudiation by a charterer is permissible only where the breach of the owner's undertaking of seaworthiness is so substantial as to defeat or frustrate the commercial purpose of the charter. The English authorities speak in these terms."

In Hong Kong Fir Shipping Co. v. Kawasaki Kisen Kaishe, 1 All E.R. 474 (1962) the British Court of Appeal met

and answered the questions here. There a time charter of December 26, 1956 let a vessel for 24 months to the charterer, with delivery at Liverpool. The agreement required the ship to be "in every way fitted for ordinary cargo service". On the day of delivery, February 13, 1957, she sailed for Newport News, Virginia to take on coal for Osaka. When accepted by the charterers at Liverpool, "her engineroom was undermanned and her engineroom staff incompetent". Because of this deficiency, her engines broke down and she lost several months of working time. Nevertheless, the charterer was denied the power to cancel the agreement.

Although the British courts may seem more lenient on this point than the American, the reasoning of the Court pertinently is notable. As a member of the unanimous Court, Upjohn, L. J. observed:

> "Yet with all respect to counsel's argument, it seems to me quite clear that the seaworthiness clause is *not in general treated as a condition* [accent added] for breach of which the charterer is at once entitled to repudiate. This is established by a number of authorities over a long period of years and I mention them without quoting from them."

> \* \* \* \* \* \*

> "Why is this apparently basic and underlying condition of seaworthiness not, in fact, treated as a condition? It is for the simple reason that the seaworthiness clause is breached by the slightest failure to be fitted 'in every way' for service. Thus, to take examples from the judgments in some of the cases I have mentioned above, if a nail is missing from one of the timbers of a wooden vessel, or if proper medical supplies or two anchors are not on board at the time of sailing, the owners are in breach of the seaworthiness stipulation. It is contrary to common sense to suppose that, in such circumstances, the parties contemplated that the charterer should at once be entitled to treat the contract as at an end for such trifling breaches."

1 All E.R. 474, 482–83 (1962).

In summary, on September 3 when the Government served its demand upon the owner to man the ship or be declared in default, and on September 4 when the loaded cargo was removed, the shipowner had not breached the contract. Consequently, the Government could not then terminate the agreement and cannot successfully claim, as it does in this action, damages for a breach at that time.

II. There is a further and overriding reason why the owner cannot be held financially answerable. It is this stipulation in the charter party:

> "Article 20. Statutory Exemptions.

> "(a) This contract is subject to all the terms and provisions of and all the exemptions from liability contained in Subsections (1), (2), and (3) of Section (4) of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936. For the purpose of this Contract, the term 'Carrier' as used in said Act shall mean the 'Owner' and the term 'shipper' shall mean the 'Government'."

The statute to which the stipulation alludes is cited as 46 U.S.C. § 1304, and in relevant parts reads as follows:

> "§ 1304. Rights and immunities of carrier and ship—Unseaworthiness

> "(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unseaworthiness, the burden of proving

the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

"Uncontrollable causes of loss

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

\* \* \* \* \* \*

"(j) Strikes, or lockouts or stoppage or restraint of labor from whatever cause \* \* \*."

■ By its terms COGSA applies only to contracts between consignor and the carrier ship; it is not interposed between charter parties. 46 U.S.C. § 1305. Nevertheless, owner and charterer may voluntarily embrace in their agreement any provision of the Act. Thereupon, of course, the incorporated text no longer has "statute rank", but is converted into a binding consensual obligation. In our judgment the clauses borrowed from COGSA and now comprised in the charter, completely forestall any recovery by the Government from the Marilena P or her owner.

■ The position advanced by the Government is that COGSA is not apt here. First, it presses that this law comprehends only "goods", and then only during "the period from the time when the goods are loaded on to the time when they are discharged from the ship", as defined in 46 U.S.C. § 1301(e). The conclusion is that the statute is not relevant to loss or damages arising apart from the cargo and before the whole intended burden enters the ship.

However, § 1301(e) was not appropriated by the charter, only 1304 (1), (2) and (3) were. Suggested, contra, is that § 1304 must necessarily be read with § 1301's definitions of "goods" and "carriage of goods" to denote only physical goods completely loaded. Thus it is said, since § 1301 implants these meanings in § 1304, when § 1304 is copied into a contract the parties are presumed so to restrict their

agreement. This reading is not applicable in the circumstances here.[2] It is a tortured implication. By not including § 1301(e) among the sections of COGSA incorporated into the charter, the parties emphatically rejected all reference to it. Further, we would require more, and nothing now appears, to convince us that the parties wished to confine the immunity provisions of a *charter* within the restrictions placed on them in a *bill of lading* or similar document.

No matter their scope in the frame of the entire Act, we think the paragraphs of COGSA as engrafted upon the charter party encompass, as well, potential liabilities not touching the freight and potential liabilities arising before the consignment is hoisted from the dock. In our opinion resort to a charter party, as just indicated, implies intent to cover comprehensively all the duties and privileges between owner and charterer. The agreement discloses a desire to be exhaustive and entire in providing the terms of the joint undertaking.

■ In refutation, the Government adverts to the particularization in § (c) of this same Article 20 of the charter. It relieves the owner from liability for loss or damage by fire "at any time and even though before loading on or after discharge from the Vessel". The implication is that the release applies to preloading events only when the clauses explicitly so state. In view of the overall purpose of the charter, to withhold the shield of Article 20 from the owner on so thin an inference, we think, would force us to choplogic and rejection of the views of courts highly respected, especially in maritime matters.

In Adamatos Shipping Co. Ltd. v. Anglo-Saxon Petroleum Co. Ltd., A.C. 133 (Appeal Cases Before the House of Lords, 1958), a time charter was to remain in force "for as many consecutive voyages as the vessel could tender for loading within a period of 18 months". By express reference COGSA was in-

---

**2.** Incidentally, in the oral argument we understood Government's counsel also to disavow reliance on any such contention.

cluded in its entirety as a part of the instrument. Treated as a paramount clause, the section before us—46 U.S.C. § 1304—was held to excuse the owners from liability for unseaworthiness under the following facts.

Surveyed during June and July 1950 and repaired at Baltimore, on July 27 the tanker Saxon Star sailed in ballast to Curacao for a cargo of coal. En route, her machinery was seriously damaged, requiring towage into San Juan. After repairs, she proceeded to Buenos Aires and there took on a shipment of oil. Leaving on August 19, 1950, her boilers began to leak, and through the remainder of her cruise this trouble continued.

The machinery damage was found imputable to the incompetence of the engineroom staff and constituted unseaworthiness. The Court of Appeal approved the form of the charter and the charterer's claim of damages for a breach by the owners. The Law Lords reversed.

The basis for the reversal was that COGSA in its relief of the owner under 46 U.S.C. § 1304(1) and (2) was not confined to the physical loss or damage to goods, but saved the owner against an unseaworthiness liability not involving the cargo.

 This, we think, is telling authority for our decision. Of course, in lifting the provisions of 46 U.S.C. § 1304 (1), (2) and (3), the charter binds the shipowner, *because the statute does,* to the "burden of proving the exercise of due diligence" to prevent unseaworthiness. But in looking again at the respondent's conduct, as related previously in discussing the fitting of the ship to put to sea, we think due diligence was exercised in this second aspect of the case.

III. The counterclaim of the shipowner will be disallowed except for the hire from 8 o'clock A.M. September 1 until 3 o'clock P.M. on September 2, a total of 31 hours, when the charterer had the use of the vessel. Article 17 of the charter, quoted supra, p. 8, provided that "the payment of hire shall cease from the time" a deficiency of crew causes a loss of time. This suspension of payment continued until the ship came on-hire again with an adequate complement of men and officers. The record nowhere discloses any such restoration of her efficiency.

 In this connection it must be remembered that the contract subsisted in full force and effect despite removal of the cargo from the Marilena P and its reshipment. However, until she was tendered equipped to continue in execution of the charter party, the Government was not liable for her hire. Moreover, until then the owner could not contest the Government's cancellation of the charter on September 8. At all events, the broker's advice on that day to MSTS of the ship's inability to perform further, was an acceptance of the Government's cancellation of September 8.

The order on review will be vacated, and the action remanded for entry of a judgment for the appellant for 31 on-hire hours at $2,400 per day, or $3,100, with costs.

Affirmed in part; vacated in part; and judgment directed.

WINTER, Circuit Judge (dissenting):

Incorrectly, in my view, the majority penalizes the praiseworthy effort of the United States to effect the simultaneous arrival of ammunition, rations and combat military goods needed by military personnel who were being transported to Vietnam by separate troop ship. My opinion is that the charter party was totally breached; the United States acted reasonably under the circumstances; there was no factual or legal defense to the breach; and the district judge correctly assessed the damages of the United States against the ship and her owner.

The facts need not be repeated. The majority sets forth most of the salient

ones; others, as found by the district judge, whose findings are amply supported, will be referred to where pertinent.

The undertaking of the ship's owner was to provide, not later than September 3, 1965, the MARILENA P to carry the cargo to Vietnam. The ship was tendered on September 1, but, by September 2, what has been euphemistically termed a strike, but what was in fact a revolt or mutiny, occurred. See, *e. g.*, United States v. Borden, Fed.Cas. No. 14,625 (D. Mass. 1857). See generally, 1 Norris, The Law of Seamen §§ 253, et seq. (1962). The crew walked off the vessel, during the process of loading, and steadfastly refused to sail to Vietnam, although the ship's destination was known to her owner before the charter party was agreed to, and there was no illegality in a Greek ship's calling at Vietnam. Although the United States extended the owner additional time—until September 8—to provide the carriage contracted for, the owner was unable to perform and, indeed, through the broker which had represented it in negotiating the charter party, informed the United States on the latter date " * * * there is no denial on the part of the owner that he cannot perform the contract but at the same time he wishes to do everything practical to assist MSTS in view of the unexpected refusal of the crew to go to South Vietnam." That the United States in the interim period unloaded the 400 tons aboard the MARILENA P in an obvious effort to meet a crucial time schedule and to minimize damages is of no significance, because nothing in the evidence suggests that the owner's unsuccessful efforts to perform were discouraged, hindered or hampered thereby. The cost of unloading may have become an added expense for the United States had the owner suppressed the mutiny within the extended time, but such was not this case.

From the scope of the undertaking, i. e., to provide a ship to carry the cargo to Vietnam, it follows that the failure to do so, whether blameworthy or not, was a breach of the charter party. Work v. Leathers, 97 U.S. 379, 380, 24 L.Ed. 1012 (1878); Davison v. Von Lingen, 113 U.S. 40, 5 S.Ct. 346, 28 L.Ed. 885 (1885); Pendleton v. Benner Line, 246 U.S. 353, 357, 38 S.Ct. 330, 62 L.Ed. 770 (1918). See also, Norrington v. Wright, 115 U.S. 188, 203, 6 S.Ct. 12, 29 L.Ed. 366 (1885); The March, 25 F. 106 (D. Md. 1885); Pedersen v. Pagenstecher, 32 F. 841 (S.D.N.Y.1887); Dexter & Carpenter Co. v. United States, 13 F.2d 498 (S.D.N.Y.1926). The majority view notwithstanding, it is difficult to imagine a more substantial, basic default in a time charter than the failure to provide a crew, unless it be the failure to supply a ship and a crew. The entire purpose of the charter party was totally frustrated.

Neither the terms and provisions of the charter party nor the provisions of the Carriage of Goods by Sea Act incorporated therein provided an escape from the breach. True, Article 17 of the charter party contemplated the possibility of loss of time without breach from deficiency of men, including, but not limited to, strikes or lockouts; but, unlike its counterpart in the hire of the substitute vessel MORMACRIGEL, Article 17 is silent as to the right of cancellation when a strike continues for a designated period. It is to be doubted that Article 17 has application to mutiny; but, even if applicable, I cannot contemplate that the charterer must be required to wait an indefinite period without remedy. Rather, in my opinion, the charterer need wait only a reasonable period, and the five days that elapsed here seem completely reasonable under the circumstances of the case, particularly in the light of the owner's admission at the end of the extension that it was unable to perform, without any suggestion that a further period would permit the breach to be cured.

In Article 20 of the charter party the parties incorporated by reference § 4 of COGSA, which, *inter alia*, excuses the ship "for loss or damage arising or re-

sulting from * * * strikes or lockouts or stoppage or restraint of labor from whatever cause, whether partial or general * * *." 46 U.S.C.A. § 1304 (2) (j). The majority treats this as a further and overriding reason why the owner cannot be held financially answerable. I am not so persuaded.

Beside the underlying problem of whether a mutiny is a strike—and I am inclined to think that it is not, because there was no claim here of entitlement to better wages or better working conditions, or any similar negotiable controversy found in a usual labor dispute [1] —there are two answers to the argument constructed by the majority. By incorporating § 4 of COGSA, it seems to me that the parties incorporated the context in which that section is applicable, even without specific reference to other sections of COGSA. Thus, the limitation in § 1 of COGSA that carriage of goods "covers the period from the time when the goods are loaded on to the time when they are discharged from the ship" is, to me, fully applicable. 46 U.S.C.A. § 1301(e). It supplies a statutory gloss on what type of strike is excusable under § 4. Since the goods contemplated to be shipped aboard the MARILENA P were never fully loaded before the mutiny occurred, and because I think it not unreasonable for the United States to have discontinued the loading operation, § 4 of COGSA never became operative. This construction renders the majority's reliance on Adamastos Shipping Co., Ltd. v. Anglo-Saxon Petroleum Co., Ltd. [1959] A.C. 133 (House of Lords), and Aspen Pictures v. Oceanic S. S. Co., 148 Cal. App.2d 238, 306 P.2d 933 cert. den., 354 U.S. 926, 77 S.Ct. 1381, 1 L.Ed.2d 1436 (1957), relied on by the owner, not in

point. But, even if operative, § 4 insulates the carrier for physical damage to the goods, not losses arising merely from delays in delivery which would have been sustained here. Commercio Transito Internazionale, Ltd. v. Lykes Bros. Steamship Co., 243 F.2d 683 (2 Cir. 1957), and States Steamship Co. v. American Smelting & Refining Co., 339 F.2d 66 (9 Cir. 1964), cert. den., 380 U.S. 964, 85 S.Ct. 1109, 14 L.Ed.2d 155 (1965), can only be read as concluding that the Act should be limited to losses involving the goods themselves, whether the losses are physical or merely concern the future sale value of the goods.

Because unnecessary to its decision, the majority discusses neither the adequacy of damages awarded nor a motion to require the United States to pay a portion of the cost of printing the appendix, because that portion was unnecessary and duplicitous. The damages assessed by the district judge included the cost of loading and unloading the MARILENA P, the cost of bringing the MORMACRIGEL, the substitute ship, from San Francisco to Seattle, and 66% of the cost of loading, sailing, fueling and discharging the MORMACRIGEL, the factor of 66% apparently being used because the MORMACRIGEL, a ship of greater capacity, was used only in part to carry the cargo originally contemplated to be carried by the MARILENA P. To me, the assessment is unexceptional, and I would affirm. The portion of the appendix required to be printed by the United States seems totally unnecessary to a decision in the case, and, if the judgment of the district court were affirmed, I would require the United States to bear that cost.

From the adverse determination of the majority, I respectfully dissent.

---

1. In this connection, it is significant that the crew rejected an offer of double wages to sail the ship as per the obligation of the charter party.