Charles L. RIGGS

v.

**PEACH STATE FORD TRUCK
SALES, INC.**

Civ. A. No. 79–1656A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Dec. 10, 1980.

Daniel Lee Dean and Edward C. Saunders, Fink, Owen, McLam & Travis, Atlanta, Ga., for plaintiff.

Sewell K. Loggins, Michael V. Elsberry, Gambrell, Russell & Forbes, Atlanta, Ga., for defendant.

## ORDER

ORINDA DALE EVANS, District Judge.

This common law fraud[1] damage suit is now before the Court for findings of fact and conclusions of law following nonjury trial. Having considered the evidence and arguments of counsel, the Court hereby finds and concludes as follows:

In 1977, Plaintiff decided he would give up his chicken farm business and become an over the road truck driver. He went to Defendant Peach State's showroom in Atlanta to purchase a used diesel tractor truck unit. His attention was drawn to one particular truck, identified by the salesman as a "1975 Peterbilt." Although Plaintiff had little expertise in matters pertaining to trucks, he had heard of Peterbilt, which was known to him to be a premier manufacturer of trucks. On inspection by Plaintiff, he observed the truck to be in apparently excellent condition. The odometer registered just over 100,000 miles which Plaintiff felt was unusual for a truck that had been driven for almost two years. He so commented to the salesman, who stated that the prior owner had used it for short hauls. After driving the truck around the block, Plaintiff indicated to the salesman that he was interested in purchasing it. The purchase price agreed upon was $25,757.75, exclusive of tax.

Digressing briefly, the Court finds that Defendant itself had acquired the truck only a couple of weeks prior to that as a trade-in. After Defendant's used truck manager had thoroughly inspected the vehicle, Defendant gave a trade-in allowance to its customer of $21,500 for the truck. In order to get the truck in shape for resale, Defendant made certain repairs which cost Defendant $925.75. Therefore, at the time of the sale to Plaintiff, Defendant had put a total of $22,750.75 in the truck.

Just before the sale to Plaintiff was to close (a few days after Plaintiff had initially looked at the truck), Defendant's used truck manager noted that the truck's serial number had a letter "K" after it. At that point, he realized the truck was what is known in the trade as a "glider kit." This meant the truck had not been assembled by Peterbilt. Rather, the chassis was made by Peterbilt and sold by it; thereafter, the major components were purchased separately and the truck had been assembled by an unknown third party. The used truck manager called this to the attention of the salesman who at that point was preparing the sale documents for signature by Plaintiff. He told the salesman to "make sure the buyer knows this is a glider kit."

When the sale documents were hand-carried by the salesman to Plaintiff, he did mention to Plaintiff that he was purchasing a glider kit, but did not do so in terms that explained what a glider kit was or which put Plaintiff on fair notice that the term earlier used by the salesman to describe the truck, to wit, "1975 Peterbilt" was incomplete or inaccurate in light of the discovery that the truck was a glider kit. The papers were signed on September 27, 1977; thereafter, Plaintiff began regularly driving the truck in the course of his business.

Plaintiff received from Defendant Defendant's customary warranty on used trucks, which was a limited warranty on the power-train components, i. e., the engine, the transmission and the rear axle, good for a period of thirty days or the first 4,000 miles, whichever first occurred. The warranty negatived any obligation of the seller to pay any consequential damages flowing

1. Plaintiff also originally sued under the provisions of 15 U.S.C. § 1988, the odometer disclosure section of the Motor Vehicle Information and Cost Savings Act, 15 U.S.C. §§ 1901 et seq. Judgment was entered in Defendant's favor on this claim at the conclusion of the evidence, on the Court's finding that the provisions of the Act did not apply to the vehicle in question as a matter of law.

from any breach, and limited its obligation to replacement or repair of the warranted item. Plaintiff did not sign or read the warranty form, although he received a copy of it at the closing which he put in a file at home.

On October 7, 1977, the truck broke down. The power divider had to be replaced. The truck had at that point been driven 3,217 miles since date of purchase; the $1,650.00 bill was paid by Defendant under the warranty. Certain associated costs, to wit, wrecker service, overnight motel charges for Plaintiff while the truck was being fixed, etc., were not paid under the warranty.

Through the months of October and November, 1977, Plaintiff had various minor repair bills, none of which were covered under the Peach State warranty.

At around the beginning of December, 1977, the truck broke down again. This time, the engine had to be removed, disassembled and rebuilt. The parts and labor cost Plaintiff $4,181.69 out of pocket, since the warranty period had expired.

Plaintiff continued to have various repairs and work done on the truck through mid-1978. Plaintiff was unable to drive the truck for 54 days while it was being repaired. If he had worked those 54 days, it would have yielded gross income of $10,800.00.[2] However, Plaintiff was able to drive another vehicle for 3 weeks during the 54 day "downtime" period which reduced his losses.

In the course of the various repair stops, Plaintiff learned that the "1975 Peterbilt" had in it a 1973 Cummins engine; a Rockwell transmission of 1969–72 vintage, and a pre-1975 differential and rear end. At some point, he also became aware that he had purchased a "glider kit." Plaintiff contends Defendant fraudulently misrepresented that the truck was a "1975 Peterbilt," when it could not be fairly so described because it was not factory assembled by Peterbilt.[3] Plaintiff contends that this representation, coupled with the alleged representation that the truck only had about 100,000 miles on it, entitled him to assume that the major components were also of 1975 vintage and had received wear and tear commensurate with limited use. He contends that in fact the major components were heavily worn and for this reason, the truck had an actual value on the date he purchased it of only $15,000.00. In support of his contention on actual value, he points to the fact that in less than a year after he purchased the truck, approximately $10,500.00 worth of repairs was done on it.

Plaintiff drove the truck until May 22, 1979, when he sold it for $18,000.00. Plaintiff seeks to collect the difference between what he paid for the truck and what he contends it was worth on the date of purchase, said alleged difference being in the amount of approximately $10,000.00; his out of pocket costs for wrecker charges and other miscellaneous costs associated with downtime, plus the income Plaintiff lost while the truck was being repaired, plus punitive damages and attorneys' fees.

■ The five elements of a cause of action for fraud and deceit in Georgia are: (1) false representation, (2) scienter, (3) intent to defraud, (4) justifiable reliance, and (5) damages. *Romedy v. Willett Lincoln-Mercury, Inc.*, 136 Ga.App. 67, 220 S.E.2d 74 (1975).

■ To the extent Plaintiff is claiming that Defendant misrepresented the mileage on the vehicle and thus by inference the vintage and condition of the major components, his claim fails. The Court does find, contrary to Defendant's argument, that

2. Plaintiff worked under a contract with Superior Trucking Company whereby he was paid $.50 a mile, out of which he had to pay operating costs.

3. Plaintiff does not contend, nor could he, that a "1975 Peterbilt" should have contained Peterbilt components. The evidence showed without dispute that Peterbilt does not manufacture the major components even for its factory assembled trucks, but rather uses components manufactured by other companies. Also, the evidence indicated Plaintiff was told at the time of purchase that the truck had a Cummins engine in it.

very low mileage on a two-year old used truck is a material factor to a truck purchaser. Further, the Court finds logical Plaintiff's line of reasoning that a 1975 factory assembled truck with 100,000 miles would more likely than not have 1975 vintage components with wear and tear commensurate with 100,000 miles of use. However, the Court finds that the evidence does not preponderate in Plaintiff's favor on the issue of Defendant's knowledge that the truck had over 100,000 miles on it or that the major components had wear and tear disproportionate to 100,000 miles' use. Plaintiff did not seek to prove that Defendant's inspection of the truck likely revealed to it the fact that the major components were pre-1975 or worn more heavily than one might expect of a low-mileage 1975 vehicle. Rather, Plaintiff sought to prove that Defendant's salesman invited reliance on the odometer reading by commenting that the party from whom Defendant purchased the truck had used it for short hauls. But the evidence did not show that this was a misrepresentation, or if it was, that it was a misrepresentation made with knowledge of its falsity or with intent to defraud. Thus, the referenced theory works only if the Court finds that Defendant, because of its expertise in appraisal of trucks, surely must have realized that the major components were more heavily worn than one might expect in a two-year old low-mileage vehicle. The Court declines to take this approach. The evidence in the record does not support it; any conclusion here would have to be based on assumption or speculation by the Court. Further, any conclusion that the true condition of the major components was likely obvious to Defendant then requires further speculation as to whether the facts should also have been obvious to a reasonably diligent purchaser.

■ There is, however, another theory based on which the Plaintiff is entitled to recover. One of the expert witnesses testified that in the trade, glider kits customarily sell for less than their factory assembled counterparts, even where wear and tear, etc., are comparable. He stated, "I don't know what it is, but the drivers are just scared of them." He said that in his opinion, the fact that a given truck was a "glider kit" had a 10 to 15 percent negative effect on resale value. The Court credits the testimony of this witness. In light of the fact that Defendant's salesman initially told Plaintiff the truck was a "1975 Peterbilt," a term which the Court believes fairly implies factory assembly by Peterbilt, Defendant then had an obligation to correct this misimpression once Defendant itself became aware of the true facts. Defendant knew or should have known that when Plaintiff signed the purchase documents, he was still acting in the belief that the truck was a 1975 factory assembled Peterbilt, which it was not and which Defendant then knew it was not. The Court further finds that Plaintiff, acting in due diligence, could not have reasonably been expected to ascertain the true facts for himself; hence, he was justified in relying on Defendant's representation that the truck was a "1975 Peterbilt."

Next is the question of what damages, if any, Plaintiff may collect. Again, the Court credits the testimony of the expert witness quoted above and finds that the fair market value of the truck, had it been a "1975 Peterbilt" was approximately 15 percent more than the actual fair market value of the truck as of the date of the sale. The Court finds that Plaintiff's actual damages are in the sum of $3,750.00.

■ The Court further finds that the additional alleged consequential damages sought to be recovered by Plaintiff did not proximately flow from the misrepresentation found by the Court to be actionable herein. The Court also finds that even though Plaintiff did not sign the warranty agreement with Defendant, he did tacitly agree to its provisions when he accepted payment under the warranty in October, 1977 and thus at that point became bound

by its provision excluding recovery for consequential damages.[4]

■ Turning to Plaintiff's claim for punitive damages, the Court does not find aggravating circumstances, per Ga. Code Ann. § 105–2002, and thus declines to award punitive damages.

Finding that Defendant's misrepresentation was an act of bad faith, an award of attorney's fees is appropriate. Pursuant to counsel's stipulation made during trial of the case, counsel for Plaintiff are hereby directed to file with the Court an application for attorneys' fees within ten (10) days of date of entry hereof. Defendant shall have twenty (20) days of date of entry hereof within which to respond. The Court will grant an oral hearing if either side requests same. Otherwise, the award of attorneys' fees will be made based upon the written submission of both sides.

In summary, Plaintiff shall have judgment of Defendant in the sum of $3,750.00, plus reasonable attorneys' fees and all costs of this litigation.

4. This is particularly true since, according to Plaintiff's own testimony, he then realized that "I possibly didn't have what I purchased."