**William B. McCONNELL, Leroy E. Truex and Talbot Bird & Co., Inc., Plaintiffs,**

v.

**CATERPILLAR TRACTOR CO. and Giles & Ransome, Defendants/Third-Party Plaintiffs,**

v.

**CHARLES ECKEL & SONS, INC. and William Eckel, Third-Party Defendants.**

**Civ. A. No. 85–2479.**

United States District Court, D. New Jersey.

Nov. 7, 1986.

Miller and Barken by Lee A. Barkan, Hackensack, N.J., for plaintiffs.

Carpenter, Bennett & Morrissey by William A. Carpenter, Jr., Newark, N.J. and Martin, Crawshaw & Mayfield by Linton W. Turner, Jr., Westmont, N.J., for defendants/third-party plaintiffs.

Ferrara & Waldman by Michael J. Waldman, Cherry Hill, N.J., for third-party defendants.

COHEN, Senior District Judge:

In this admiralty case, plaintiffs William B. McConnell and Leroy E. Truex, commercial fishermen, and Talbot Bird & Co., Inc., their insurer, seek to recover damages sustained due to the breakdown of a defective crankshaft manufactured by defendant Caterpillar Tractor Co. ("Caterpillar"), and distributed by defendant Giles & Ransome. Defendants have filed claims for contribution against third-party defendants Charles Eckel & Sons, Inc., and William Eckel ("the Eckels"), the installers of the defective crankshaft. Defendants Caterpillar and Giles & Ransome, joined by third-party defendants the Eckels, move here for summary judgment on the issue of liability. Plaintiffs in turn have filed a cross-motion for summary judgment on the same issue. For the reasons that follow, we grant defendants' motion for summary judgment on plaintiffs' strict products-liability claim, and deny all other motions for summary judgment.

FACTS

In February, 1982, plaintiffs McConnell and Truex bought the F/V Howard Reed, a 1979 quality marine trawler that had been sunk and salvaged. Plaintiffs planned to use the vessel for the commercial gathering of scallops.

The Caterpillar engine of the Howard Reed needed an overhaul, and plaintiffs hired third-party defendants, the Eckels, to do the work. In May, 1982, plaintiffs decided to replace the original crankshaft in the engine, and the Eckels accordingly ordered a new crankshaft from Inlet Diesel, an authorized Caterpillar dealer. Inlet Diesel placed the order with defendant Giles &

Ransome, an authorized Caterpillar distributor. It is unclear whether the new crankshaft was delivered from Inlet Diesel to the Eckels, or was picked up by plaintiff McConnell from Giles & Ransome. In any event, the new crankshaft made its way into the hands of the Eckels in early June, 1982.

The crankshaft was covered by the standard Caterpillar warranty, which provided that Caterpillar would repair or replace defective parts during the first six months after purchase but would not cover labor. The warranty also provided:

> This warranty is expressly in lieu of any other warranties, express or implied, including any warranty of merchantability or fitness for a particular purpose. Remedies under this warranty are expressly limited to the provision of parts as specified above and any claims for loss arising out of the failure of the parts or exchange components to perform for any period of time, or other economic or moral loss, or direct, immediate, special, indirect or consequential damage are expressly excluded.

Plaintiffs allege that neither they nor the Eckels ever received the warranty, and defendants do not appear to contest this. Defendants allege, however, that both plaintiffs and the Eckels were aware that the crankshaft was subject to the terms and conditions of the warranty, as they had bought Caterpillar parts in the past and had periodically filed warranty claims.

When the crankshaft arrived at the Eckels in June, 1982, their mechanic noticed that it had different oil seals and timing markings than the old crankshaft. He twice contacted someone at Giles & Ransome, and was told both times that the new crankshaft was fine. The mechanic then installed the new crankshaft.

It appears that a Corrective Action Notification dated September 22, 1982, was sent by Caterpillar to Giles & Ransome. The notification reported "major engine failure due to crank timing marks being punched two teeth off," and stated, "all questionable cranks were to have been returned to Mossville for rework. Mossville did rework approximately 80 crankshafts." It is unclear whether this notification covered the crankshaft involved in this case. The notification was received by Giles & Ransome on October 6, 1982. There is apparently no dispute that neither plaintiffs nor the Eckels were notified by Caterpillar or Giles & Ransome of any problem.

After the engine overhaul on the F/V Howard Reed was completed, a dock trial was conducted and revealed no engine trouble. On December 1, 1982, plaintiffs operated the Howard Reed from their dock in Atlantic City, New Jersey, towards the Dorchester Shipyard in Millville, New Jersey, for drydock repairs. When the Howard Reed was about 45 minutes from Atlantic City, the engine "failed" according to defendants, "exploded" according to plaintiffs. Defendants concede that the cause of the engine trouble was a defect in the new Caterpillar crankshaft, and that considerable damage was done to the engine.

After experiencing the engine trouble, the Howard Reed drifted at sea with no power. The F/V Emily-Marguerite, another vessel owned by plaintiffs, was radioed for help, and towed the Howard Reed back to the inlet with help from a third vessel owned by plaintiffs, the F/V Ocean Bird. A tugboat towed the Howard Reed from the inlet to a dock in Atlantic City, and repair work was completed in February, 1983.

As mentioned above, defendants concede that the crankshaft was defective. Caterpillar paid plaintiffs $13,155.83, plus $947.83 in freight charges, to repair or replace damaged parts. Caterpillar alleges that this payment was to honor its express warranty; plaintiffs concede that the Eckels made a warranty claim on their behalf, but it is unclear exactly what warranty they are referring to.[1]

---

1. Paragraph 38 of the complaint provides, "defendants Caterpillar and Giles & Ransome sold the crankshaft to plaintiffs McConnell and Truex with an express and implied warranty of fitness for use in the Howard Reed." The only warranty that appears in the exhibits is the

Plaintiffs in this action seek to recover labor costs incurred in repairing the damaged engine, towing costs, the salary they paid the captain of the Howard Reed to keep him available while plaintiffs repaired the vessel, and lost profits. They allege, first, that defendants are strictly liable for damages resulting from the breakdown of the defective crankshaft. They further allege that Caterpillar's and Giles & Ransome's failure to notify them of the defect in the crankshaft constituted negligence. Finally, they allege that they are entitled to consequential damages for defendants' breach of implied warranties of merchantability and fitness for a particular purpose.

Defendants, in turn, assert that under admiralty law, plaintiffs are barred from recovering under their tort theories. They also assert that the standard Caterpillar warranty, with its limitation on remedies, precludes plaintiffs from recovering under a breach of warranty claim. Alternatively, defendants argue that even if plaintiffs are not bound by the warranty, defendants are not liable for plaintiffs' consequential damages because they had no reason to know that such damages would be incurred.

DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment is to be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." If there is a factual dispute, the appropriate judicial inquiry under Rule 56 is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202

(1986); *see also Bushman v. Halm,* 798 F.2d 651, 657 (3d Cir.1986). If no facts are in dispute, the court should, of course, grant summary judgment to the party entitled to judgment as a matter of law.

## I. Products-Liability Claim

This case is before us under the court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333 (1966). Defendants assert that the recent Supreme Court decision, *East River Steamship Corp. v. Transamerica Delaval Inc.,* —— U.S. ——, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), mandates that plaintiffs' products-liability claims in admiralty be dismissed.

In *East River,* a group of ship charterers sued defendant, who had designed, manufactured, and supervised the installation of turbines in the chartered ships, alleging that defendant was strictly liable for design defects in the turbines and was negligent in the installation of a valve. The only damage was to the turbines themselves, and the charterers sought recovery for the cost of repairing or replacing the allegedly defective parts, and for income lost while the ships were out of service.

The Court first held that it joined the Courts of Appeals in recognizing products-liability as part of the general maritime law. *Id.* at 2299. The Court then confronted the conflict among the Courts of Appeals sitting in admiralty on the proper approach to products-liability claims when the defective product causes injury only to itself, and the resultant loss is purely economic.[2]

The Court noted that the majority of Courts of Appeals that had considered the issue had held that a manufacturer is liable for economic losses when a defective product injures only itself, whether or not the defect created an unreasonable risk of

express parts warranty, which explicitly disclaims any implied warranties of merchantability or fitness for a particular purpose.

**2.** "Typically, economic losses are the costs of repairing or replacing a product and the loss of profits from the use of the product," as opposed

to bodily injury or damage to other property caused by the defective product. *Ingram River Equipment, Inc. v. Pott Industries, Inc.,* 756 F.2d 649, 652 (8th Cir.1985), *vacated, Pott Industries, Inc. v. Ingram River Equipment, Inc.,* —— U.S. ——, 106 S.Ct. 3269, 91 L.Ed.2d 560 (1986).

harm. 106 S.Ct. at 2301 (citing *Emerson G.M. Diesel, Inc. v. Alaskan Enterprise,* 732 F.2d 1468 (9th Cir.1984)). The Court continued that a second view imposed liability on the manufacturer only when the users of the product were "endangered," the determination turning on "the nature of the defect, the type of risk, and the manner in which the injury arose." 106 S.Ct. at 2301. The Court rejected both of these approaches, and adopted a third view, holding that when a product injures only itself and losses are purely economic, a manufacturer is *not* liable under a negligence or strict products-liability theory, regardless of the circumstances under which the injury occurred. *Id.* at 2302.

The Court noted that products-liability developed as a result of a policy judgment that "people need more protection from dangerous products than is afforded by the law of warranty," but cautioned that "if this development were allowed to progress too far, contract law would drown in a sea of tort." *Id.* at 2299–300. The Court said that in cases in which a product injures only itself, causing purely economic losses, the appropriate avenue of relief is a breach of warranty action. It explained that "the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of the bargain—traditionally the core concept of contract law." *Id.* at 2302.

At issue in the case before us is whether the *East River* holding is applicable to fishermen. In footnote five of the opinion, the Court, after acknowledging the split in the Courts of Appeals on the issue at bar, noted:

Most of the admiralty cases concerned fishing vessels. See *Emerson G.M. Diesel, Inc. v. Alaskan Enterprise,* 732 F.2d 1468, 1472 (CA9 1984) (relying on solicitude for fishermen as a reason for a more protective approach). Delaval [the defendant in *East River* ] concedes that the courts, see *Carbone v. Ursich,* 209 F.2d 178, 182 (CA9 1953), and Congress, see 46 U.S.C. § 533, at times have provid-

ed special protection for fisherman. This case involves no fisherman.

The *East River* opinion, therefore, left open the question of whether its holding was applicable to fishermen. We believe, however, that were the Court to address the issue, it would extend the *East River* holding to fishermen, and deny them recovery for purely economic losses in products-liability suits.

It is true that a number of cases decided *before East River* relied on a "solicitude for fishermen" in allowing recovery for purely economic losses in products-liability actions brought by fishermen. In *Emerson G.M. Diesel, Inc. v. Alaskan Enterprises,* 732 F.2d 1468 (9th Cir.1984), cited in footnote five of the *East River* opinion, the court held that the defendant, the supplier of a defective hose incorporated into the diesel engine on plaintiff's fishing vessel, was strictly liable for plaintiff's repair costs and lost profits even though the defective product injured only itself. The court based its holding on "the familiar principle that seamen are favorites of admiralty and their economic interests entitled to the fullest possible legal protection." *Id.* at 1472 (citing *Carbone v. Ursich,* 209 F.2d 178, 182 (9th Cir.1953)). *See also Jones v. Bender Welding & Machine Works, Inc.,* 581 F.2d 1331, 1337 (9th Cir. 1978).

However, an examination of most of the cases that have permitted fishermen to recover lost profits where other plaintiffs could not do so reveals that the favored status of fishermen appears to have originated, and thereafter has been invoked, in a different context than that of *Emerson, East River,* and the instant case. The cases generally involve negligence suits in which there is no contractual relationship between the plaintiff-fishermen and the defendant, and the focus is "not on the applicability of the law of sales or tort law, but on concerns that the defendant will be liable for remote or speculative damages." *Miller Industries v. Caterpillar Tractor Co.,* 733 F.2d 813, 820, *reh. denied,* 738 F.2d 451 (11th Cir.1984).

In *Carbone v. Ursich,* 209 F.2d 178 (9th Cir.1953), a case frequently invoked by courts in their discussions of fishermen's special status, plaintiff-fishermen, crew members of a vessel, sought to recover lost income when their employment contract with the vessel's owner was disrupted by defendant's negligent injury to the vessel's fishing net. The *Carbone* court recognized that under *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), recovery for economic loss was unavailable if the loss resulted from damage to property in which the plaintiff had no proprietary interest.[3] But the *Carbone* court held that the *Robins Dry Dock* rule did not apply to fishermen, who were subject to a "special rule" because of their status as "favorites of admiralty." 209 F.2d at 182. The *Robins Dry Dock* rule has been viewed as a "pragmatic limitation imposed by the Court upon the tort doctrine of foreseeability." *Louisiana ex rel. Guste v. M/V Testbank,* 752 F.2d 1019, 1023 (5th Cir.1985), cert. denied, *White v. M/V Testbank,* — U.S. ——, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986). The *Carbone* court, therefore, excepted fishermen from the general rule that a plaintiff who suffers economic losses because of a defendant's negligent injury of another's property cannot recover because his claim is too remote.

Other cases that have made reference to fishermen's special status likewise have involved factual settings in which the plaintiff-fishermen have no contractual relationship with the defendant, and their claims would be barred as too remote under *Robins Dry Dock* absent their special status. In *Louisiana ex rel. Guste, supra,* two vessels collided in the Mississippi River Gulf Outlet, causing a chemical spill that closed the outlet for almost three weeks and suspended all fishing, shrimping and related activities. Claims were filed by marina and boat rental operators, wholesale and retail seafood enterprises, seafood restaurants, and others, including commercial fishermen. The district court granted defendants' motion for summary judgment as to all claims except those of the commercial fishermen. The Court of Appeals affirmed, reasoning that claims for economic loss absent physical damage to a proprietary interest were too remote to be cognizable. 752 F.2d at 1024. The court noted, however, that commercial fishing interests were "deserving of a special protection." *Id.* at 1021 & 1027 n. 10. *See also Miller, supra; Union Oil Co. v. Oppen,* 501 F.2d 558 (9th Cir.1974).[4]

■ In short, most of the cases that have conferred special treatment on fishermen have done so in a context where there is no contractual relationship between the fishermen-plaintiffs and the defendant, and where plaintiffs' claims would be dismissed as too remote absent the special exception.[5] These cases clearly are distinguishable from the situation involved in *East River* and in the case before us, where plaintiffs *did* have a contractual relationship with defendants. We believe that in light of the analysis of the appropriate balance between tort and contract law in *East River,* it is appropriate to hold that a manufacturer in a commercial relationship has no duty under a negligence or strict products-liability theory to prevent a product from injuring itself—even if the plaintiffs are fishermen.[6] Plaintiffs here have alleged only

**3.** "A tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong." *Robins Dry Dock,* 275 U.S. at 309, 48 S.Ct. at 135.

**4.** The special treatment of fishermen has not been universal; at least two cases have declined to treat fishermen differently than other plaintiffs. *See Henderson v. Arundel Corp.,* 262 F.Supp. 152 (D.Md.1966), *aff'd,* 384 F.2d 998 (4th Cir.1967); *Casado v. Schooner Pilgrim, Inc.,* 171 F.Supp. 78 (D.Mass.1959).

**5.** In *East River,* the Court appears to have declined to address the continuing viability of recovery of economic losses under these circumstances. *See* 106 S.Ct. at 2302, n. 6.

**6.** Plaintiffs appear to argue that the *East River* holding should not apply to them because they are not in a "commercial relationship" in the sense contemplated by the Supreme Court in *East River;* that, although they are commercial fishermen, they cannot "set the terms of their own agreements" to protect their interests, 106 S.Ct. at 2303, but must accept the standard terms imposed by the manufacturer. However,

economic losses. We therefore grant defendants' motion for summary judgment on plaintiffs' strict liability claim, and deny plaintiffs' summary judgment motion on that claim.

## II. Negligence Claim

■ Plaintiffs allege that both Caterpillar and Giles & Ransome were negligent in failing to notify them of the defect in the crankshaft. We first note that the *East River* decision, as we read it, does not bar plaintiffs' negligence claim. It is true that in *East River*, plaintiff-charterers, in the fifth count of their complaint, alleged that the defendant negligently supervised the installation of a valve, and that the Supreme Court disallowed recovery on this count as well as on the strict products-liability counts because the losses sustained were purely economic. However, in *East River*, plaintiffs alleged that the negligence occurred "as part of the manufacturing process." 106 S.Ct. at 2297. The alleged negligence in the instant case is distinguishable; plaintiffs here assert, not that defendants negligently manufactured the crankshaft, but that they negligently failed to warn plaintiffs of a known defect in the crankshaft.

In *Miller Industries v. Caterpillar Tractor Co.*, 733 F.2d 813 (11th Cir.1984), the court addressed the distinction between the negligent manufacture of a product and the negligent failure to warn of a defect in the product. The *Miller* court distinguished the situation before it from the situation involved in another case, *Jig the Third Co. v. Puritan Marine Insurance Underwriters Corp.*, 519 F.2d 171 (5th Cir. 1975), *cert. denied*, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976). The *Miller* court explained that in *Jig the Third*,

> the plaintiff's claim was premised on the negligent design and manufacturing of the product and thus was closely related

to the quality of the product and the plaintiff's expectations of how the product would perform. Here, however, the gravamen of the plaintiffs' complaint is that the defendant failed to properly warn of defects that it discovered after the engine was already on the market. Whatever the merits of adopting a rule that views defects in a product as part of the parties' bargain and thus within the law of sales, it is much less tenable to presume that the buyer has bargained away the manufacturer's obligation to warn of defects that later come to the manufacturer's attention. A duty to warn of a product's defects of which the seller becomes aware goes not to the quality of the product that the buyer expects from the bargain, but to the type of conduct which tort law governs as a matter of social and public policy (citations omitted). To hold otherwise would impermissibly allow a manufacturer who is aware that it has a defective product on the market to hide behind its warranty while the buyer unknowingly uses it.

*Id.* at 818.

We find the reasoning in *Miller* persuasive. Thus, we hold that *East River*, where the alleged negligence occurred as part of the manufacturing process, does not bar plaintiffs' claim in this case, where there was an allegedly negligent failure to warn.

Although plaintiffs, then, would prevail if they could prove that defendant negligently failed to warn them of the defect, we are unable to resolve the negligence issue on the basis of the record before us.

In order for a duty to warn to arise, a manufacturer must have "knowledge, or the reasonable opportunity to acquire knowledge, about the product's dangerous propensities."[7] Schwartz, *The Post-Sale*

---

the tenor of the Court's opinion—its notation that such business losses as plaintiffs suffered can be insured, and that "the increased cost to the public that would result from holding a manufacturer liable in tort for injury to the

product itself is not justified,"—leads us to reject plaintiffs' argument.

7. We note here that we believe the defective crankshaft was sufficiently dangerous to warrant the imposition of a duty to warn. There is uncontradicted evidence that, due to the defect

*Duty to Warn: Two Unfortunate Forks in the Road to a Reasonable Doctrine*, 58 N.Y.U.L.Rev. 892, 892 (1983); *see also Miller*, 733 F.2d at 820. At a number of points, Caterpillar appears to assert that the defect in the crankshaft involved here was unique and that the Corrective Action Notification did not cover the crankshaft. Plaintiffs, however, assert that the Corrective Action Notification *did* cover the crankshaft, and Giles & Ransome appear to concede that it did. We thus are confronted with a factual dispute as to whether Caterpillar knew of the defect or had a reasonable opportunity to acquire such knowledge. Therefore, the preliminary question of whether a duty to warn ever arose cannot at this point be answered. Accordingly, all summary judgment motions on the issue of negligence are denied.[8]

### III. Breach of Warranty Claim

■ The parties dispute whether the Caterpillar warranty, with its limitation on remedies, is binding on plaintiffs, who indisputably never received a copy of it.[9] Defendants allege that because plaintiffs were familiar with the terms of the warranty from their past dealings with Caterpillar, and because they actually accepted payment under the warranty, they are bound by its terms.

We agree with defendants that plaintiffs should not be permitted to accept the benefits under the warranty without being restricted by its limitations. *See, e.g., Riggs v. Peach State Ford Truck Sales, Inc.*, 503 F.Supp. 190, 193–94 (N.D.Ga.1980) (although plaintiff did not sign warranty

· agreement with defendant, he tacitly agreed to its provisions when he accepted payment under the warranty, and at that point became bound by warranty provisions excluding recovery for consequential damages).[10] However, it is unclear whether plaintiffs, when they accepted a payment from Caterpillar, intended to accept payment under the standard Caterpillar warranty. *See supra* note 1. We thus cannot grant summary judgment on this issue for either party at this juncture; elaboration of the circumstances surrounding the payment to plaintiffs is necessary.

Defendants allege that even if the Caterpillar warranty is not controlling, summary judgment should be granted in their favor. They note that where there has been a breach of implied warranty of merchantability or fitness for a particular purpose, consequential damages cannot be awarded unless the defendant had reason to know of the general or particular requirements and needs of the plaintiff. N.J.S.A. 12A:2–715(2). Because there is conflicting evidence as to whether defendants had reason to know of these requirements, we will deny defendants' motion on this issue.

For the foregoing reasons, all summary judgment motions are denied except for defendants' motion on plaintiffs' strict products-liability claim, which is granted.

---

in the crankshaft, the engine exploded, releasing hot water and steam that came close to scalding a crew member.

**8.** We do not find it necessary at this point to address the issue of whether, if there *was* a duty to warn, the notification sent out by Caterpillar to Giles & Ransome was adequate to discharge Caterpillar's duty. Nor need we consider whether the wording of the notification justified Giles & Ransome's apparent belief that Caterpillar had repaired all defective crankshafts.

**9.** The Uniform Commercial Code, as adopted by the New Jersey legislature, governs this warran-

ty claim in admiralty. *See East River*, 106 S.Ct. at 2303 n. 7.

**10.** Plaintiffs rely on *Diepeveen v. Larry Vogt, Inc.*, 27 N.J.Super. 254, 99 A.2d 329 (App.Div. 1953), for the proposition that after a contract to sell has been entered into, and title has passed to the buyer, a disclaimer of warranties is ineffectual. This reliance is misplaced. In *Diepeveen*, there was no allegation that the buyer was aware of the disclaimer or that he had accepted payments under any accompanying express warranties.