**ZIDELL, INC., Plaintiff,**

v.

**The CARGO, FREIGHT AND SUB-FREIGHT OF the BARGE ZPC 404, in rem, Defendants.**

No. C85–2427D.

United States District Court,
W.D. Washington.

May 22, 1987.

Terence K. McGee, McGee & Reno, Seattle, Wash., for plaintiff.

Thomas J. McKey, Bogle & Gates, Seattle, Wash., for claimant Shemya Constructors.

## MEMORANDUM OPINION

DIMMICK, District Judge.

This is an action *in rem* brought under the Court's admiralty jurisdiction. Plaintiff Zidell, Inc. ("Zidell") seeks to foreclose its lien against the cargo, freight, and subfreight of the BARGE ZPC 404, owned by Zidell and chartered to Shemya Constructors, Inc. ("Shemya"). Zidell moves for summary judgment dismissal of the counterclaims of claimant Shemya and partial summary judgment on Zidell's own claims. Shemya in turn moves for partial summary judgment on its counterclaims. After considering the memoranda and affidavits submitted by counsel, the Court denies Shemya's motion and grants partial summary judgment to Zidell, dismissing Shemya's counterclaims and declaring the charter enforceable under its terms. The Court, however, defers a determination of the full amount of the liability as it involves issues of material fact.

## FACTS

The parties have submitted two sets of stipulated facts, including a copy of the bare boat charter of the BARGE ZPC 404. The following facts include some from the stipulation and others unchallenged in the papers submitted by the parties. The charter was signed August 30, 1985, by Zidell and Shemya. It provided for the charter to commence September 10, 1985 and run for 35 days at $21,000 ($600 per day), with an option to extend for up to three 10–day periods for $600 per day upon proper no-

tice. Otherwise hire was to be at the rate of $900 per day, increasing to $1,200 per day after the holdover period. Under the charter's terms, Shemya assumed all responsibility for repairs and for acquiring insurance, and accepted the barge "as is." Zidell disclaimed any warranty of seaworthiness.

The barge was delivered to Shemya September 10, 1985. Shemya had engaged the tug POLAR MERCHANT to tow the barge loaded with construction material to Shemya Island in the Aleutians. During a period of rough weather en route, the tow pads (the eyes through which the tow wires are connected) on the barge severed, causing the barge to break free. The tug was grounded by the tow wire, and the barge nearly collided with the tug. The tug released and consequently lost the tow wire. It went in search of the barge, which it eventually snared and took to Kodiak for repairs. Zidell air-expressed new tow pads to be installed on the barge.

Following repairs, the barge was towed by the POLAR MERCHANT to the Aleutians where the construction material was off-loaded on Shemya Island October 23. While there the tug and barge encountered additional tribulations necessitating repair of the tug. The barge was eventually towed back to Seattle December 13, 1985, where additional repairs were made to it. The barge was redelivered to Zidell January 6, 1986.

There are a number of disputed facts. The major disagreement is over the cause of the breakage of the tow pads. Zidell's theory is that they broke because of the tug captain's error in allowing too much slack in the tow line (catenary) when the barge was being pushed by a following sea. An expert supporting Zidell states that the wire could have grounded first, causing the barge to be forced up against the taut line and snapping the tow pads. Shemya, on the other hand, offers an eyewitness, the captain of the tug, who attests that the grounding of the tow wire did not occur until the tow pads severed.

Shemya also presents expert evidence that the steel used in the tow pads contained 49 percent carbon whereas 27 percent carbon steel (grade A–36) is called for in vessels subjected to extreme ocean conditions. Steel with a higher carbon content does not have the ductility to withstand the cold temperatures and rough weather of ocean hauling. Zidell offers no contradictory evidence as to the actual quality of steel used in the tow pads. But Zidell presents evidence that it was the practice of Zidell Exploration, Inc., the builder of the barge, to use American Bureau of Shipping grade A steel (similar to A–36 steel), and Zidell had no reason to believe that the tow pads were constructed of any lesser quality. Shemya offers no proof of actual knowledge on the part of Zidell or Zidell Exploration, Inc., but argues that Zidell Exploration, Inc. should have known of the high carbon content steel. Further, Shemya attributes the knowledge of Zidell Exploration, Inc. to Zidell because of commonality in the ownership and directorships of the two corporations.

Evidence of the anticipated weather and temperature at the time of the charter is significant to Shemya's allegations of consequential damages resulting from repair delays. Shemya says it was warned against taking a tow into the Gulf of Alaska after October 15 because of adverse weather conditions.

 A further dispute concerns the time for which hire is owed. Shemya contends the barge was proffered for delivery prior to January 6, 1986, but not accepted by Zidell. Shemya claims it made repairs to the barge which were attributable to wear and tear. In addition, the parties disagree over the rate of hire and whether or not proper notice was given for an extension at the original rate.

These last issues as to the rate of hire and time for which it is owed involve genuine issues of material fact requiring trial. Dismissal of Shemya's counterclaims, however, is justified because there are no material facts in dispute. Even if the Court accepts Shemya's version of the mishap involving the tow pads and accepts the fact that Zidell Exploration, Inc., negligently manufactured the tow pads, the counter-

claims must be dismissed as a matter of law, pursuant to Fed.R.Civ.P. 56.

## SHEMYA'S COUNTERCLAIMS

Shemya claims that Zidell is liable to it for the following:

1. *Failure to perform contract:* For failure to provide a barge that was seaworthy and capable of being towed, in violation of the charter party and the express and implied warranties therein [1];

2. *Negligence:* For its negligent design, manufacture and construction of the barge, including its defective tow bits;

3. *Negligence:* For fraudulent and negligent misrepresentation and/or concealment of the faulty condition of the barge prior to charter;

4. *Strict liability, manufacturer's implied warranty:* For breach of the implied warranty of suitability or fitness for the use intended, that is, for use as a barge capable of being towed, in the design, manufacture and construction of the barge; and

5. *Strict liability, lease of defective product:* For charter of the barge in a defective and unreasonably dangerous or unsafe condition.

Answer at 6–7.

Shemya has apparently abandoned its claim Nos. 2, 4 and 5 above. Its remaining claims are for (a) material breach of contract and consequential damages; and (b) misrepresentation or failure to warn.

## ISSUES

1. Did provision of a Maltese Cross A–1 barge whose tow pads severed at sea because of their lack of ductility constitute a material breach of a bare boat charter to supply an ocean-going barge, when the terms of the contract provide that charter-er accepts the vessel "as is" and the owner disclaims all warranties of seaworthiness?

2. Did Zidell have notice that the tow pads were constructed of steel which would not withstand extreme ocean conditions thus imposing on Zidell a duty to warn?

The Court's answer to both questions is "No."

## ANALYSIS

On its breach of contract theory, Shemya argues that the charter party specified a Maltese Cross A–1 ocean-going barge, and tow pads that withstand ocean stresses are basic to such a barge. The defense to this argument is the contract itself.[2] Zidell did deliver a barge approved by the American Bureau of Shipping as a Maltese Cross A–1 vessel, which to all appearances was fit for ocean towing. Pursuant to the contract, Shemya had ordered an inspection which revealed no defect. The contract states that charterer accepts the barge "as is" and recognizes that the owner "disclaims any and all warranties, whether express or implied, concerning the seaworthiness of the vessel...." Contract at ¶ 8.

Although Shemya cites cases which hold that the obligation of the charterer to pay depends upon the vessel's being as described, the cases are distinguishable. For example, in *Aaby v. States Marine Corp. (TENTO)*, 181 F.2d 383 (2d Cir.1950), the court held that breakage of a lube oil pump shaft in an auxilliary motor 15 minutes after delivery raises a presumption that the vessel was defective on delivery. But because the voyage was held up for only 2½ days because of the defect it was not a fundamental breach. The *Aaby* court, however, referred to the implied warranty of seaworthiness "in all contracts concerning vessels in the absence of an express and unambiguous stipulation to the con-

---

1. Shemya's claim No. 1 as argued is more accurately designated an affirmative defense. Shemya claims a material breach of contract resulting in repudiation or discharge of the contract and liability for consequential damages. The designation as affirmative defense or counterclaim, however, is not crucial here. Under Fed.R.Civ.P. 8(c), the Court may treat the pleading as if properly designated.

2. In its memoranda, Shemya hints that the charter was an adhesion contract. But it presents no evidence of unequal bargaining power, nor does it argue the issue.

trary." *Id.* at 385. In the instant case, there was an unambiguous disclaimer of warranty.

In another case cited by Shemya, the court held that a statement that a vessel was *expected* to arrive on a certain date was not equivalent to agreeing that she *would* arrive, which could be considered fundamental to the contract. *Petroleum Export Corp. v. Kerr Steamship Co. (the Silver Pine)*, 1929 A.M.C. 905. This Court would agree that failure to deliver on a date promised may be fundamental. But Zidell delivered on the date specified in the contract and delivered the barge described in the contract.

A 1986 United States Supreme Court opinion is helpful although not dispositive on this issue. *East River Steamship Corp. v. Transamerica Delaval, Inc.*, — U.S. ——, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). The contractual facts in *East River* are nearly identical to this case. Plaintiffs had bare boat charters on four tankers for extended periods of time, with each charterer responsible for repairs to the tankers and return to the owners at the end of the charter. The charterer took in "as is" condition, following inspection, with agreement to provide insurance. *East River* plaintiffs, however, instituted their suit against the manufacturer of the tanker turbines, rather than the owner of the tankers. Although the *East River* plaintiffs sued under a products liability theory, the Court's opinion emphasizes contractual principles which logically apply in the case before this Court. Recognizing the incorporation of the theory of products liability in general maritime law, the *East River* Court nonetheless held that the public policy rationale for products liability did not warrant its application in the circumstances. Reviewing the wide divergence in judicial decisions, the Court opted for a separation of contract warranty law from negli-

gence or strict liability, holding that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products theory to prevent a product from injuring itself." *Id.*, 106 S.Ct. at 2302 (footnote omitted). The Court also included economic damages such as repair costs and lost profits to be within contract law, part of the bargain and insurable. *Id.* at 2302.

The rationale for the *East River* holding lies primarily within the Court's view of economic reality.

> Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude into the parties' allocation of the risk.

*Id.* at 2303 (citations and footnotes omitted).

Zidell and Shemya set the terms of their own agreement. Shemya accepted the barge "as is" and accepted the risk of any inherent defect. Zidell delivered the barge as described.

◼ Shemya's second theory is alleged misrepresentation and failure to warn by Zidell. Shemya contends that Zidell misrepresented the seaworthiness of the barge and had a duty to warn of the inherent defect in the tow pads. Shemya relies on *McConnell v. Caterpillar Tractor Co.*, 646 F.Supp. 1520 (D.N.J.1986), and a subsequent unpublished opinion of the same court, declining reconsideration, No. 85–2479 (D.N.J. Feb. 5, 1987).[3] What Shemya

---

**3.** Shemya also finds support in *Emerson G.M. Diesel, Inc. v. ALASKA–ENTERPRISE*, 732 F.2d 1468 (9th Cir.1984). There the court held that the manufacturer of a hose was strictly liable for repair costs and consequential losses to a fishing vessel resulting from the malfunction of the hose. The primary issue in *ALASKA–EN-*

*TERPRISE* was whether or not economic losses were properly included in a products liability claim; there was no discussion of tort versus contract application. To the extent that Shemya relies on *ALASKA–ENTERPRISE* to support its claim for manufacturer's liability, the holding in *East River* supercedes it. The Court notes, how-

neglects to mention about the *Caterpillar* case, however, is that the court there distinguished between a case of negligent manufacture and a failure "to properly warn of defects that it discovered after the engine was already on the market." *Id.* at 1526. Thus, *Caterpillar* addresses *actual* knowledge and distinguishes between the duty in that case and negligent manufacture or products liability. The latter are clearly governed by *East River* as discussed above. The *Caterpillar* court declined to grant summary judgment on the duty to warn issue since there was a "factual dispute as to whether Caterpillar knew of the defect or had a reasonable opportunity to acquire such knowledge." *Id.* at 1527.

Shemya presents no evidence that either Zidell or Zidell Explorations had actual knowledge that the tow pads would not withstand ocean conditions.[4] The barge had, in fact, been leased before without problems. Shemya appears instead to be presenting a products liability argument clothed in "failure to warn" language. Shemya presents the affidavit of a workman employed at Zidell Exploration, who attests to improper welding procedures. He was, however, employed there prior to the time the barge was constructed. Shemya also presents unrebutted evidence concerning the quality of steel used in the tow pads. These may indeed constitute negligent manufacturing procedures. If so, however, *East River* holds that contract principles rather than tort principles will be applied when the parties are operating in a commercial setting and there is no injury to persons or property.[5] Such is the case here.

ever, that the *East River* Court recognized that fishing vessels might be a possible exception, and *ALASKA–ENTERPRISE* was a fishing vessel. 106 S.Ct. at 2301 n. 5.

4. Although Zidell admits to a common board of directors in 1984 and to the same general manager in 1983, Shemya presents no further evidence for considering the corporations to be one and the same. Nor does Shemya present any legal arguments on this issue. In any event, the argument is not germaine to the Court's analysis. Even if Zidell Exploration's negligent

## CONCLUSION

THEREFORE, the motion of Shemya Constructors, Inc. for partial summary judgment is DENIED. Zidell, Inc. is GRANTED partial summary judgment dismissing Shemya's counterclaims and defenses to enforcement of the contract. Liability is established, but the amount will be determined at trial.

manufacture could be attributed to Zidell, the charter between the parties would control, following *East River.*

5. In reaching this decision, the Court concludes that the loss of the tow wire (released by the tug in order to pursue the runaway barge) is not the type of property loss that would tip this case into tort analysis. Shemya raises the spector of loss of life had the barge collided with the tug. Fortunately, it did not. There are no injuries alleged.